Fire Insurance Rating Bureau, Appellant, vs. Rogan, Commissioner of Insurance, Respondent.

*June 3—June 26, 1958.*

For the appellant there were briefs by *Rieser, Mathys, McNamara & Stafford* of Madison, and *Watters & Donovan* of New York, N. Y., attorneys, and *R. M. Rieser* of Madison, and *James B. Donovan, John N. Reid,* and *Patrick J. Hughes,* all of New York, N. Y., of counsel, and oral argument by *Mr. R. M. Rieser, Mr. James B. Donovan,* and *Mr. Reid.*

For the respondent there was a brief by the *Attorney General* and *Harold H. Persons,* assistant attorney general, and oral argument by *Mr. Persons.*

BROADFOOT, J.   In 1944 the United States supreme court decided that a fire insurance company which conducts a substantial part of its business across state lines is engaged in interstate commerce.   It further determined that concerted action between insurance companies to fix and maintain

arbitrary and noncompetitive rates violated the Sherman Anti-Trust Act. *United States v. South-Eastern Underwriters Asso.* 322 U. S. 533, 64 Sup. Ct. 1162, 88 L. Ed. 1440.

In 1945 congress passed the McCarran Act, 15 USCA, Regulation of Insurance, pp. 257–260, secs. 1011–1015. This act suspended until 1948 the application of certain federal laws and gave states authority to regulate and tax the business of insurance even though it involved interstate commerce. Thereafter the National Association of Insurance Commissioners, after conferring with a committee representing the insurance companies, drafted a model for the Fire Insurance Rating Act which has been enacted by the legislatures of most of the states. The model act, with slight variations, was enacted by the Wisconsin legislature in 1947 to be effective January 1, 1948, as sec. 203.32, Stats.

A reading of the statute involved reveals that the legislature adopted a different policy for the establishment of insurance rates than it did for the fixing of rates for public utilities. The legislature has given the public service commission authority to fix utility rates. Those rates may be changed thereafter upon a proper showing by interested persons. Customers may procure a reduction if they are able to show that the rates are excessive. Utilities may procure an increase in rates by showing that the same are inadequate or confiscatory. That policy works very well with utilities as their production costs can be fairly well established in advance.

In the case of insurance rates the insurers, either singly or through a rating organization, are authorized to file proposed rates. With such filings the insurer must furnish supporting information to the commissioner of insurance to show that the proposed rates were calculated in accordance with the statute; in other words, that the proposed rates are reasonable. The commissioner is authorized to

review the proposed rates as filed to determine whether they meet the requirements of the statute. Following such review the commissioner may approve the rates as filed or he may disapprove the same. In case of a disapproval the commissioner must specify in what respects he finds the rates filed fail to meet the requirements of the statute.

The statute provides that rates shall not be excessive, inadequate, or unfairly discriminatory. Sub. (3) (a) 3 of sec. 203.32 provides that in determining proper rates due consideration shall be given (1) to past and prospective loss experience within and without this state; (2) to conflagration and catastrophe hazards; (3) to a reasonable margin for underwriting profit and contingencies; (4) to dividends, savings, or unabsorbed premium deposits allowed or returned by insurer to policyholders, members, or subscribers; (5) to past and prospective expenses both country-wide and those specially applicable to this state; (6) to all other relevant factors within and without this state; and (7) to the experience of the fire insurance business during a period of not less than the most-recent five-year period for which such experience is available.

In filing proposed new rates it seems to us that the statute contemplates that the bureau is faced with the difficult problem of estimating what will happen in the future. The best guide to the future is what has happened in the past. Its calculations must be based on estimates advisedly made rather than on conjecture. They should be based on all of the information available. First it must estimate what future expenses and future losses will be. A further estimate must be made on future conflagration and catastrophe hazards, and then a rate must be calculated that will provide for payment thereof plus a reasonable margin for underwriting profit.

In reviewing the proposed rates the duty of the commissioner and his staff is the same. In general the same informa-

tion is available to both. Admittedly it is a difficult task to make intelligent estimates when all of the factors are variable. It is not surprising that the bureau's staff and the commissioner's staff should arrive at different estimates when there is no mathematical formula or slide rule that will permit the calculation of exact percentages of earned premiums to be allocated for future expenses, losses, and underwriting profits.

For the purpose of reviewing the proposed rates the commissioner's staff prepared many exhibits and computations to show that the rates filed by the bureau do not comply with the statute. The difference between the bureau's computations and those of the commissioner's staff are that different percentages of earned premiums were used in estimating future expenses and future losses. The bureau contends that in estimating future expenses and future fire losses it used a five-year average, while the commissioner's staff, although it tabulated the figures for five years, gave more weight to the figures for the year 1954, the last year for which such figures were available. The bureau contends that the statute requires a five-year average to be used. Members of the commissioner's staff testified that they gave due consideration to the figures for the five prior years but that they made certain calculations based on the trends shown thereby. The statute is not as rigid as the bureau contends. The statute provides that due consideration shall be given to the experience of the fire insurance business during a period of not less than the most-recent five years for which such experience is available, but nothing therein directs that an average be used.

It is agreed that in general fire insurance rates should be reduced. The ratio of fire losses to earned premiums has been declining. Undoubtedly this is due to more zoning laws, new building codes, and more-adequate fire protection.

It is common knowledge that the expenses of operating any business are going up. The costs of maintaining offices, whether owned or leased, salaries, printing, and supplies, etc., are increasing. A substantial expense in the insurance business is commissions paid to agents. Percentagewise that probably does not fluctuate. If premiums are increased commissions will increase. If rates are reduced commissions will be reduced.

Extended coverage includes loss by windstorm, hail, explosion, riot, aircraft, vehicles, and smoke, among others. In general it is agreed that the premiums for extended coverage insurance were too low. The computations made by the commissioner's staff indicated that the proposed rates would result in so great an increase that the resulting rates would be excessive. It is clear that an attempt to chart the future as to those items presents more difficulties than does consideration of fire insurance. Laws and regulations are of little help in controlling the perils insured against. An efficient inspection system would not be of great help in this situation as it is in preventing fire losses. Since this case was argued before us, tornadoes created havoc in a large area in western Wisconsin. No one could have foreseen that when the statistics were being reviewed and the estimates made. Probably, however, this would be covered by the catastrophe allowance.

It is difficult for us to understand how there can be any constant figure used in the various computations. However, both sides seem to agree that one per cent of earned premiums is adequate to cover fire losses for unusual conflagrations, and that the same percentage would cover losses occasioned by catastrophes such as unusual windstorm, hail damage, etc. Both parties seem to agree further that a fixed percentage could be used to cover underwriting profit, although they are 100 per cent apart as to what that fixed percentage should be. The members of the commissioner's staff contend that

two and one-half per cent is adequate and that a larger figure would be excessive. The bureau contends that five per cent is required.

In his brief the commissioner calls attention to the fact that in 1950 the then commissioner used the figure of two and one-half per cent as a reasonable underwriting profit in passing on rates and that the matter was compromised with the bureau. Further, that in the eighty-sixth annual report of the commissioner of insurance for the year 1954 the commissioner stated that in determining the permissible loss ratio two and one-half per cent was a reasonable margin for underwriting profit. He states further that the record in Wisconsin is consistent and that the using of a two and one-half per cent profit factor is not an innovation. He infers that that figure has been definitely settled in Wisconsin. If so, it is without statutory authority. In 1947 when the model fire rate law was before the legislature the then commissioner had a bill introduced as a substitute that would have provided for an underwriting profit of two and one-half per cent. The bill was No. 69, S., and the legislature refused to enact it.

Both the bureau and the commissioner are placing undue emphasis upon arriving at a constant figure as an underwriting profit. If two and one-half per cent of earned premiums is used but the estimates for future expenses and future losses are high, then the underwriting profit will be increased. On the other hand, even though the five per cent figure is used, if the figures for future expenses and for future losses are underestimated, the entire five per cent could easily be wiped out. There is no way of insuring that bureau members and subscribers will earn any exact percentage of earned premiums.

It was agreed by the parties, both in the circuit court and before this court, that the statute does not give the commissioner authority to establish rates. Nor can we find in the statute any authority for this court to determine rates or the

percentages to be used for any of the factors necessary to determine a fair and reasonable rate.

The bureau contends that in effect the commissioner has adopted the figures prepared by his staff and in his decision and order he is attempting to do indirectly what he could not do directly. The bureau contends that the effect of the commissioner's determination is that no rates will be approved by him that do not comply with his staff's computations. The position of the bureau is understandable when the exhibits prepared by the commissioner's staff are considered in the light of the testimony given by members of his staff. If the bureau is correct in its argument the decision of the commissioner is invalid. However, in view of his statements both in the circuit court and before this court he is precluded from so asserting in the future.

A study of the record indicates that rate making, like the law, is not an exact science. However, the statute seems to provide a workable plan. We are informed that this is the first case involving the establishment of rates for fire insurance and allied lines to reach the highest appellate court of any state under the provisions of similar statutes. We do not propose to resolve the controversies that arose at the hearing as to the ratios used or the methods of computing them. We are without authority to prescribe the exact formula to be followed, and if we had the authority it would be impossible to make such determinations without delaying our decision for several months. For practically two years the bureau has been operating under interim rates provided by the order of the circuit court. Almost two years' experience has been gained in operating under those interim rates. In view of this added experience it may be that some of the controversial issues are now moot.

From the record we conclude that the commissioner was justified in determining that the proposed rates as filed did not meet the requirements of the statute. The ultimate de-

termination of the commissioner is supported by substantial evidence in view of the entire record; he did not proceed in excess of his statutory authority; his determination and order was not arbitrary and capricious, and does not deprive the members and subscribers of the bureau of their property without due process of law.

Our determination will require the bureau to file new rates. The interim rates will remain in effect until that can be done and the new rates are approved by the commissioner following conferences or a hearing.

*By the Court.*—Judgment affirmed. The bureau shall file new schedules of rates for fire and extended coverage insurance within sixty days after the record herein is remitted. The interim rates now on file in the office of the commissioner will remain in effect until new rates are approved by the commissioner of insurance. No costs to be taxed, but the bureau shall pay the clerk's fees.

WINGERT and HALLOWS, JJ., took no part.