MORTGAGE GUARANTY INSURANCE CORPORATION, Appellant (Plaintiff),

v.

John T. LANGDON, Commissioner of Insurance for the State of Wyoming, Appellee (Defendant).

VEREX ASSURANCE, INC., Appellant (Petitioner),

v.

John T. LANGDON, Insurance Commissioner, Department of Insurance, State of Wyoming, Appellee (Respondent).

Nos. 5127–5130.

Supreme Court of Wyoming.

Oct. 2, 1981.

Paul B. Godfrey, Godfrey & Sundahl, Cheyenne, for appellant in No. 5127.

Nick Kalokathis, Lathrop & Uchner, P. C., Cheyenne, for appellant in No. 5130.

John D. Troughton, Atty. Gen. and Bob R. Bullock, Senior Asst. Atty. Gen., Cheyenne, for appellee in Nos. 5127 and 5130.

Before RAPER, C. J.,[a] McCLINTOCK,[b] THOMAS and ROSE, JJ.,[c] and GUTHRIE, J., Retired.[d]

THOMAS, Justice.

In this appeal the Court must concern itself with the authority of the Commissioner of Insurance for the State of Wyoming (hereinafter referred to as the Commissioner) to regulate the private mortgage insurance business and with the manner of exercise of that authority. The Commissioner entered separate orders providing with respect to Verex Assurance, Inc. (hereinafter referred to as Verex) that the approval previously given to its premium rate schedule should be withdrawn, and providing with respect to the appellant Mortgage Guaranty Insurance Corporation (hereinafter referred to as MGIC) that the approval previously given to its policies, including the premium rate schedule, should be withdrawn. The Commissioner's grounds for withdrawing the previous approvals were that the loss ratios of these companies for Wyoming were significantly lower than in other states, making the premium rates in Wyoming excessive, the benefits in Wyoming unreasonable in relation to the premium charged, and resulting in unfair discrimination against premium-paying Wyoming residents. The Commissioner also

a. Chief Justice at the time of oral argument.

b. Retired March 26, 1981, but continued to participate in the decision of the court in these cases pursuant to the order of the court entered March 30, 1981.

c. Chief Justice since January 5, 1981.

d. ROONEY, J., having recused himself, GUTHRIE, J., Retired, was assigned, having been retained in active judicial service pursuant to § 5, Art. V, Wyoming Constitution, and § 5–1–106(f), W.S.1977, by order of the court entered on January 1, 1979.

found fault with the amount of the first-year premium, the level renewal premiums, the continuation of coverage when the appraised value of the property at the time of the loan exceeded the loan balance by 25 percent, the provision that all premiums received became fully earned upon payment of a claim, and, in the case of Verex, he also objected to the minimum premium retention of $50 on certificates of insurance cancelled during the first year. The only value component with respect to the private mortgage insurance business which the Commissioner considered was insurance against default. The appellants, Verex and MGIC, appealed the Commissioner's determinations, and the district court affirmed the Commissioner's orders. We conclude that the Commissioner's restriction of his consideration to the insurance feature only of private mortgage insurance was unduly narrow and did not constitute a proper application of standards to this unique style of insurance. We shall reverse and remand the cases for further consideration.

On January 20, 1977, the Commissioner issued a notice of hearing addressed to all insurance companies selling mortgage guaranty insurance in Wyoming, advising that the purpose of the hearing was to ascertain whether the Commissioner should disapprove the rate and policy form filings of the several companies as they pertained to mortgage guaranty insurance and lease guaranty insurance. This order specified some 11 different areas of concern. A request was made by MGIC that its hearing be held separately, and this request was granted. The first hearing involving Verex and three of the other companies began on April 6, 1977. These other three companies then agreed to be bound by the disposition made in the MGIC hearing, and the Verex hearing resumed without their participation on April 18, 1977.

Following the conclusion of the Verex hearing the Commissioner, on May 6, 1977, issued an order withdrawing the approval of its premium rate schedule effective on June 6, 1977. On that same day a separate order was issued withdrawing the rate schedules of all companies, including MGIC.

The Commissioner justified this action by stating that it would be inequitable to disapprove the Verex rates while allowing other companies to continue using the same rates. MGIC and Verex petitioned the District Court of Laramie County for an order staying the Commissioner's orders pending appeal by Verex and further hearing before the Commissioner as to MGIC. This was granted by the district court. The MGIC hearing began July 11, 1977, and proceeded on various dates with full participation by MGIC. On October 4 the Commissioner issued an order withdrawing the previous approval of the rate schedule and policy forms of MGIC. The orders in the two cases are essentially the same with both containing extensive findings of fact, conclusions of law and justifying discussion by the Commissioner.

As explained by the record before this court, private mortgage insurance companies offer to conventional home mortgage lenders a limited amount of protection against loss if the homeowner-borrower defaults on the home loan mortgage. While the lender is the insured party under the contract, the premium cost is paid in all instances by the borrower or mortgagor. The homeowner-borrower is the premium-paying Wyoming resident referred to in the Commissioner's orders. The limited coverage ranges from 10 or 20 percent on loans where the loan to value ratio is 80 percent or under through 25 percent where the loan to value ratio is 80 to 90 percent or 90 to 95 percent. Premiums increase based upon increases in the percentage of coverage and higher loan to value ratios. For example, under the most commonly used annual plan, pursuant to which the borrower continues to pay premiums during the entire term of the loan or for such shorter period as the insured mortgagee may require, the first premium is 1 percent where the loan to value ratio is 95 percent and the coverage is 25 percent, and the renewal premiums are ¼ percent for all subsequent years. If the loan to value ratio were 80 to 90 percent with 20 percent coverage, the first premium is ½ of 1 percent and ¼ percent in all subsequent years.

The record is clear that in Wyoming such insurance is an essential feature with respect to granting of loans where the loan to value ratio is 80 percent or higher. The mortgage lenders require mortgage guaranty insurance in connection with those loans as a condition of making the loan. The primary justification of the Wyoming mortgage lenders for this requirement is that it is essential for them to market these loans to other lenders outside of Wyoming. It is the position of the Wyoming mortgage lenders that they must be able to engage in this secondary market in order to have available money to provide loans to service new home buyers in Wyoming. The economic fact associated with this position is that Wyoming is a capital short state, and consequently Wyoming lenders must market their loans to financial institutions outside the state in order to have new capital available to lend to home buyers.

The critical factual findings by the Commissioner with respect to Verex point to its experience of a nationwide loss ratio of 21.6 percent during the years 1971 through 1976, while its loss ratio in the State of Wyoming was .61 percent. With respect to MGIC the Commissioner found that in the same 6-year period it had experienced a nationwide loss ratio of 19.75 percent, while its loss ratio in the State of Wyoming had been .67 percent. Comparing these to the experience of all other companies, the Commissioner noted that the loss ratio of all other companies on a national basis was 20.35 percent and that the loss ratio of all mortgage guaranty insureds in Wyoming was .58 percent. The Commissioner also noted that in the states of Wyoming, Nebraska, Colorado, Utah, Idaho, North Dakota, Montana, and South Dakota, Verex's loss ratio was only 7.45 percent of total premium earned, and that MGIC in the states of Wyoming, Nebraska, Utah, Idaho, North Dakota, Montana, and South Dakota, had a loss ratio of only 2.8 percent of premium earned. He noted in the latter instance that the loss ratio would still be less than 5 percent if Colorado were included.

Based upon the loss ratio findings, the Commissioner then concluded with respect to both Verex and MGIC that the premium rate schedule utilized in Wyoming was excessive—the benefits provided to Wyoming property owners were unreasonable in relation to the premium charged in violation of § 26.1–270(a)(iv) and § 26.1–316(e), W.S. 1957.[1] In addition, the Commissioner concluded that the failure of the insurance companies to differentiate their premium rate schedules between those areas of the country which have produced the greatest losses and those areas of the country which have incurred the fewest losses, such as Wyoming, discriminated unfairly against premium-paying Wyoming residents in violation of § 26.1–270(a)(iv), W.S.1957 (§ 26–14–105(a)(iv), W.S.1977) and § 26.1–316(e), W.S.1957 (§ 26–15–113(a)(v), W.S.1977). The Commissioner further found that the assessment of a first-year premium which is disproportionate to the risk being assumed and the assessment of the same renewal premium for subsequent years of coverage was unfairly discriminatory against premium-paying Wyoming residents, in violation of § 26.1–270(a)(iv), W.S.1957 (§ 26–14–105(a)(iv), W.S.1977) and § 26.1–316(e), W.S. 1957 (§ 26–15–113(a)(v), W.S.1977). The Commissioner also concluded that the premiums were unreasonable in relation to benefits provided to premium-paying Wyoming residents when the principal balance of the loan decreased to the point where the appraised value of the property (at the time the loan was obtained) exceeded the princi-

---

1. These statutory provisions have been renumbered. Section 26.1–270(a)(iv), W.S.1957, now appears as § 26–14–105(a)(iv), W.S.1977, and it provides:

"Rates shall not be excessive, inadequate or unfairly discriminatory."

Section 26.1–316(e), W.S.1957, now appears as § 26–15–113(a)(v), W.S.1977. The statute provides that the Commissioner shall withdraw any previous approval of an insurance policy only on one or more of the following grounds, and subparagraph (v) provides:

"If the commissioner finds that the benefits provided in the policy are unreasonable in relation to the premiums charged, or that such rates or classification are excessive, inadequate or unfairly discriminatory. * * *"

pal value of the loan by 25 percent. The Commissioner in addition concluded that the practice of providing that all premiums received become fully earned upon the payment of a claim violated § 26.1–262(a), W.S. 1957.[2]

In the case of Verex the Commissioner also concluded that the minimum premium retention of $50 on certificates cancelled during the first year of coverage was excessive and unreasonable and in violation of § 26.1–270(a)(iv), W.S.1957 (§ 26–14–105(a)(iv), W.S.1977) and § 26.1–316(e), W.S. 1957 (§ 26–15–113(a)(v), W.S.1977). He did conclude that the assessment of premiums from the time when the loan transaction was closed until the borrower actually made his first payment did not violate the referenced statutory provisions.

Based upon these conclusions the Commissioner withdrew the approval given to Verex's premium rate schedule. In the instance of MGIC the Commissioner withdrew the approval previously given to the policies, including the premium rate schedule. Verex and MGIC appealed their respective orders to the District Court of the First Judicial District in and for Laramie County. That court entered a judgment in each case affirming the action of the Commissioner as provided in Rule 12.09, W.R.A.P, which sets forth the appropriate actions by the district court in appeals from administrative agencies.

As expressed in its brief the issues and points of argument asserted by Verex are as follows:

"I. THE COMMISSIONER'S FAILURE TO ADDUCE EVIDENCE OF EXCESSIVE PROFITS RESULTED IN ACTION THAT WAS ARBITRARY, VIOLATIVE OF DUE PROCESS AND VIOLATIVE OF W.S. 9–4–224.

"1. The Department Failed To Adduce Evidence That Verex's Profits Were Excessive.

"2. The Arbitrary Action Violated Due Process.

"3. The Commissioner Failed To Specify The Underlying Evidentiary Facts Upon Which He Based His Findings Of Ultimate Facts And Conclusions of Law.

"4. The Commissioner Has Failed To Follow The Mandate Embodied in W.S. 26–14–105.

"5. A National Underwriting Risk Pool Is Essential Under The Effect Of Federal Law.

"II. TO LIMIT THE UNDERWRITING RISK POOL TO WYOMING IS ARBITRARY, VIOLATIVE OF EQUAL PROTECTION AND DUE PROCESS, AND ALSO VIOLATES THE SUPREMACY CLAUSE OF THE U.S. CONSTITUTION.

"1. The Action Violated Principles of Equal Protection And Due Process.

"2. The Action Violates The Supremacy Clause.

"3. The Commissioner Has Misapplied The Discrimination Statute.

"III. TO THE EXTENT THAT W.S. 26–14–105 FAILS IN SPECIFICITY, IT REPRESENTS AN UNLAWFUL DELEGATION OF LEGISLATIVE POWER.

"IV. WHEN STATUTES ARE VAGUE, DUE PROCESS REQUIRES THE AGENCY TO PROMULGATE STANDARDS IN ORDER TO INSURE FAIRNESS.

"V. SINCE THE NOTICE WHICH INITIATED THESE PROCEEDINGS WAS DEFECTIVE, THE ACTION MUST BE SET ASIDE.

"1. The Failure To Conform To The Department's Own Rules And To Conform to W.S. 9–4–107(b)(iv).

"2. The Due Process Violation."

The MGIC position with respect to the issues on appeal as set forth in its brief is as follows:

---

**2.** Section 26.1–262(a), W.S.1957, has been renumbered as § 26–13–121, W.S.1977, and it provides:

"(a) No person shall willfully collect any sum as premium or charge for insurance, which insurance is not then provided or is not in due course to be provided (subject to acceptance of the risk by the insurer) by an insurance policy issued by an insurer as authorized by this code."

"1. The Commissioner violated every precept of due process, both from a standpoint of common law and as said precepts are codified in the Administrative Procedure Act.

"2. The Commissioner exercised powers not granted to him by the statutes of the State of Wyoming and, if said powers are granted to the Commissioner, he interpreted and applied the statutes in an unconstitutional manner.

"3. The actions of the Commissioner constituted an interference with and a burden upon interstate commerce."

We shall address primarily the authority of the Commissioner to regulate the private mortgage insurance companies doing business in the State of Wyoming, and the manner in which that authority was exercised in these instances. In doing so, we shall consider the matter of standards to be applied to this rather unique form of insurance. We shall also deal with the matter of procedural due process and other matters which may reoccur in the further consideration of these cases before the Insurance Commissioner. We cannot at this time make any conclusion as to the asserted interference with and burden upon interstate commerce. That issue must await the further proceedings before the Commissioner.

The general power of the Commissioner to enforce the provisions of the Insurance Code is set forth in § 26–2–109, W.S.1977. In that statutory provision he is given rather broad power to conduct examinations and investigations with respect to identifying violations of the Code or securing information useful in the lawful administration of any provision. Specific authority for the Commissioner to withdraw any previous approval of a policy form filed with him is found in § 26–15–113, W.S.1977. The considerations upon which rates as to casualty and surety insurance shall be made are set forth in § 26–14–105, W.S.1977, as follows:

"(a) All rates as to casualty and surety insurance shall be made in accordance with the following provisions:

"(i) Due consideration shall be given to past and prospective loss experience within and outside this state, to catastrophe hazards, if any, to a reasonable margin for underwriting profit, to past and prospective expenses both countrywide and those specially applicable to this state, and in the case of participating insurers to policyholders' dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members or subscribers;

"(ii) The systems of expense provisions included in the rates for use by any insurer or group of insurers may differ from those of other insurers or groups of insurers to reflect the requirements of the operating methods of any such insurer or group with respect to any kind of insurance, or with respect to any subdivision or combination of insurances for which subdivision or combination separate exspence provisions are applicable;

"(iii) Risks may be grouped by classifications for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. Such standards may measure any difference among risks that can be demonstrated to have a probable effect upon losses or expenses;

"(iv) Rates shall not be excessive, inadequate or unfairly discriminatory.

"(b) Except to the extent necessary to meet the provisions of subdivision (iv) of subsection (a) of this section, uniformity among insurers in any matters within the scope of this section is neither required nor prohibited."

The appellants complain of the generality of § 26–14–105 with respect to standards, but we conclude that standards with respect to the regulation of insurance matters need not be established exclusively by statute or through prior rule or regulation. Ad hoc adjudication in the course of consideration of a specific problem is an

appropriate method of establishing standards in an area such as this. *New Hampshire-Vermont Physician Service v. Durkin*, 113 N.H. 717, 313 A.2d 416 (1973). *See Security and Exchange Commission v. Chenery Corporation*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995, reh. denied 332 U.S. 783, 68 S.Ct. 26, 92 L.Ed. 367 (1947). Furthermore we conclude that there has not been an improper or unconstitutional delegation of power to the Commissioner pursuant to these statutes. *State ex rel. Wisconsin Inspection Bureau v. Whitman*, 196 Wis. 472, 220 N.W. 929 (1928). Other jurisdictions have found no inhibition to the action of the administrator under similar statutory provisions where that official was determining whether rates were excessive, inadequate or unfairly discriminatory. *Massachusetts Medical Service v. Commissioner of Insurance*, 344 Mass. 335, 182 N.E.2d 298 (1962); *Insurance Services Office v. Whaland*, 117 N.H. 712, 378 A.2d 743 (1977); *Long v. National Bureau of Casualty Underwriters*, 209 Tenn. 435, 354 S.W.2d 255 (1962); and *Fire Insurance Rating Bureau v. Rogan*, 4 Wis.2d 558, 91 N.W.2d 372, 377 (1958). We conclude that the Insurance Commissioner in the State of Wyoming does have authority under the applicable statutes to regulate private mortgage insurance.

Our concern and basis for disposition in this case in not so much with respect to what the Commissioner did do as it is with respect to what he did not do. The Commissioner proceeded on the premise that the only value component with respect to the purchase of mortgage guaranty insurance is the insurance feature. We do not criticize such an assumption by one in the role of the Commissioner. It is his job to treat with insurance companies and insurance problems, and in so doing he well might assume that only insurance is involved. We conclude, however, that such a premise with respect to mortgage guaranty insurance, as a matter of law, is unduly restrictive. The Commissioner should consider relevant factors other than specified factors enumerated in a statute. Cf., *Long v. National Bureau of Casualty Underwriters*, 209 Tenn. 245, 354 S.W.2d 255 (1961).

We noted earlier the requirement of mortgage lenders for such insurance in connection with conventional home mortgage loans unless the borrower can make a down payment of 20 percent. It is common knowledge that 20 percent of a purchase price for a home at this time in Wyoming is a minimum of several thousand dollars. Not all those who are interested in purchasing homes and who can make scheduled monthly payments are able to produce such a down payment. To such purchasers there is a value factor in connection with mortgage insurance which is separate from the insurance feature, and that is the value of the opportunity to borrow the money. Realistically, that is an item of value which the purchaser obtains in connection with mortgage insurance. We recognize, as the Commissioner did, that the premium is being paid by that purchaser. It is essential to consider the business transaction from his point of view as well.

In terms of the insured, the mortgage lender in such arrangements, there is another value factor, and that is the opportunity to resell the mortgage on the secondary market. The economic necessity for having the opportunity for resale has been alluded to earlier. Wyoming is a capital short state, and there is a need to be able to replenish capital funds by permitting Wyoming mortgage lenders to market mortgages on the secondary market outside the state. Indeed if we were to identify a burden upon interstate commerce by virtue of the Commissioner's action, it well might be the burden upon the home financing business rather than the insurance business.

The record here is replete with testimony by expert witnesses about these factors. Even the primary witness who articulated the position of the insurance department testified on cross-examination as follows:

"Q. Now, as far as the function of private mortgage insurance, what do you perceive it to be, to just simply be some kind of insurance such as a household insurance or *do you perceive it to be a*

vehicle by which people are able to obtain loans?

"A. *I think in some cases that is a by-product of it.*

"Q. What other product does pmi insurance have? I mean, now you have criticized the fact that the party that is really protected is the bank or the S&L; isn't that true?

"A. Well, I'm not really criticizing that. The primary function in my mind of private mortgage guarantee insurance is the protection of the lender.

"Q. All right.

"A. I mean, I'm not being critical of the fact that lenders desire this protection.

"Q. *Is there any other function for pmi other than the protection of the lender?*

"A. *I think in some circumstances that it does facilitate access to the secondary market, it does facilitate or ameliorate to some extent a capital short situation in some states.* I wouldn't really be emphatic about the importance of it, but *I think that's another by-product of it.*

"Q. If the borrower such as you when you went to the American National Bank, for example, goes into a bank and knows that the party protected is the bank and that he would never get the proceeds if he defaults, is there actually any benefit to the borrower then?

"A. *If a borrower is in a situation where he has exhausted all of his private resources and the best that he can do is still come up with a bare 5 percent down, then I would be forced to conclude that in that situation it enables him to buy a house at that particular point in time, where as it might be impossible for him to otherwise do so."* (Emphasis added.)

Indeed the recognition of multiple value factors appears in the conclusions of law of the Commissioner in the form of ascribing motivation to lenders. In the conclusions of law relating to MGIC the following language appears:

**3.** It is to be regarded as what it is regardless of how it is styled by the administrative agency or where it is located in its order. *Stockmen's*

"The homeowner in Worland, Wyoming, pays the same premium as the homeowner in Detroit, Michigan, even though the lender in Detroit insists upon obtaining coverage because he recognizes a great risk of default, while the lender in Worland obtains coverage on an excellent risk simply to facilitate the sale of the loan on the secondary market."

In the Verex file the same concept is expressed in this way:

"The homeowner in Butte, Montana, pays the same premium as the homeowner in Detroit, Michigan, even though the lender in Detroit insists upon obtaining coverage because he recognizes a great risk of default, while the lender in Butte obtains coverage on an excellent risk simply to facilitate the sale of the loan on the secondary market."

While the specific evidence to support such statements, which are findings of fact rather than conclusions of law,[3] is not apparent, arguably they may represent appropriate inferences. Certainly they belie the statement made by the Commissioner in the findings of fact in the MGIC order to this effect:

"Likewise was nothing presented at this hearing which has persuaded me that the availability of a secondary financial market is material or even relevant to insurance premiums for mortgage guaranty insurance."

■ We give credence to the witness' statements that by-products of mortgage insurance are that it furnishes a vehicle by which people are able to obtain loans and that it facilitates access to the secondary market. We also give credence to the Commissioner's statements of dual motivation. We conclude that what is manifested in the record is a multiple value factor in connection with private mortgage insurance. The value factors that the Commissioner eschewed in treating with these cases are those of availability of money to loan and the opportunity to receive a loan. The stat-

*Bank and Trust Co. v. Financial Institutions Board*, Wyo., 616 P.2d 1273 (1980).

ute, any regulations of the Commissioner and this adjudicatory proceeding all are silent as to the standards for determining and weighing the value to be attached to these other value factors. It is possible that if dealt with upon appropriate evidence, the Commissioner might conclude the value was nil. In refusing to consider these value factors, however, the Commissioner did treat with this matter in an arbitrary fashion and in so doing did abuse his discretion and failed to consider the multiple value factors in accordance with law. For this reason we hold unlawful and set aside the agency action, findings and conclusions. Prior to making conclusions of law such as were here made the Commissioner should segregate the cost of mortgage guaranty insurance among these factors, and then limit his regulatory considerations to the amount allocated to the value of the insurance factor.

In the absence of the assignment or at least the consideration of the value of those factors identified as the opportunity to receive a loan and to have access to the secondary market, we conclude that the benefits may or may not be unreasonable to Wyoming property owners in relation to the premiums charged. The failure to differentiate the premium rate schedule between high loss ratio areas and Wyoming may or may not discriminate unfairly against Wyoming residents. The assessment of a first-year premium disproportionate to the risk being assumed and the assessment of the same renewal premium for each and every year may or may not be unfairly discriminatory against premium-paying Wyoming residents. The same comment is pertinent with respect to the premium assessed being reasonable when the principal balance has declined so that the appraised value at the time the loan is made exceeds the principal balance by 25 percent. It also could apply to the Commissioner's criticism of the practice of providing that all premiums received become fully earned upon payment of a claim.

In summary we hold that in connection with the regulation of private mortgage insurance the pragmatic realities demand that the Commissioner take into account in the development of standards for regulation of policy forms and rates the multiple value factors which attach to such transactions. Regulation based only upon the insurance feature without considering and making findings of fact and conclusions of law with respect to the other value factors of importance to both lenders and borrowers in Wyoming is arbitrary and an abuse of discretion. Standards set in the absence of such considerations are not in accordance with law. Indirect regulation of the home financing business by failure to recognize those components of the value factor in the cost of mortgage guaranty insurance constitutes action in excess of the statutory authority of the Commissioner.

Turning to some other matters that best are resolved at this time, the Court concludes that the contention of the appellants with respect to a deprivation of procedural due process cannot be sustained. Both appellants assert lack of proper notice and argue that their hearings were conducted in such a way as to deny them procedural due process. MGIC emphasizes the proposition that what was instituted as a fact-finding investigation evolved into an adversary proceeding, but in a context in which the decision actually was made prior to the hearing. The appellants assert a denial of due process under the Wyoming Administrative Procedure Act, §§ 9–4–101(a)(ii) and 9–4–107(b)(iv), W.S.1977.

Chapter 15 of Title 26, W.S.1977, by its own terms applies to all insurance contracts except re-insurance, policies or contracts not issued for delivery in this state, and wet marine and transportation insurance. Section 26–15–101(a), W.S.1977. For our purposes § 26–15–112, W.S.1977, requires all proposed insurance policies or contracts to be filed with the Commissioner for his approval. A policy must be filed 45 days before it can take effect, and if no action is taken within that time it is deemed approved by the Commissioner. This 45-day period can be extended by the Commissioner for an additional 45 days. The conclusory language of § 26–15–112(b) is, "The com-

missioner may at any time, after notice and for good cause shown, withdraw such approval." An appeal is permitted from either a denial or withdrawal of approval.

Section 26–15–113 relates to the grounds for disapproval of a policy form and it provides in pertinent part:

"(a) The commissioner shall within forty-five (45) days after filing of the insurance policy, disapprove any form filed under W.S. 26.1–315 [26–15–112] or withdraw any previous approval thereof, only on one (1) or more of the following grounds:

\* \* \* \* \* \*

"(v) If the commissioner finds that the benefits provided in the policy are unreasonable in relation to the premiums charged, or that such rates or classification are excessive, inadequate or unfairly discriminatory. If the commissioner does not approve the insurance policy, the insurer may request a hearing pursuant to the provisions of the Wyoming Administrative Procedure Act [§§ 9–4–101 to 9–4–115]."

If the Commissioner within the 45-day period has acted to approve a policy, he still may withdraw that approval without affording a hearing. Pursuant to the provisions of § 26–15–112(c), W.S.1977, he simply disapproves or withdraws approval of the policy or rate, stating the grounds therefor. The remedy of the applicant in such an instance is to ask for a rehearing, thereby invoking the pertinent provisions of the Wyoming Administrative Procedure Act and any rules of court applicable thereto. A different situation prevails if the 45 days have expired. While there is specific authority for the Commissioner to revoke an approval in that instance, it can only occur "after notice and for cause shown." There is a legislative distinction between the situations. The legislature has directed in the latter instance that the Commissioner must give notice of a hearing and at the hearing show cause why his previous action should be rescinded before revocation. The legislative mandate is clear, and we cannot avoid the conclusion that both MGIC and Verex were entitled to notice and hearing

before the previous approval of the policy form and rates could be revoked.

There is no question that the order of May 6, 1977, directed to all other companies, entered in connection with the Verex order was made before MGIC had been afforded a hearing. Relief was obtained in the district court, however, and a stay of enforcement of the Commissioner's order became effective. Thereafter the matter was heard completely, and MGIC had ample opportunity to participate in the hearing. There was dialogue between counsel and the Commissioner with respect to the adequacy of the notice, which resulted in an apparent agreement that MGIC waived its objection concerning notice but reserved its objections concerning the lack of hearing prior to the entry of the May 6, 1977, order. Verex continues to assert that the notice was defective.

 The Commissioner's position that the notice which was given in January 1977 was sufficient must be sustained. The notice referred to the statutes claimed to have been violated, stated that the hearing was scheduled for the general purpose of ascertaining whether the Commissioner should disapprove the rate and policy form filings of any or all of the respondent companies, and specified eleven areas in which the policies were deemed to be in violation. The notice was mailed January 20, 1977; the hearing was originally set for three days beginning March 9, 1977; and the hearing except as to MGIC actually commenced on April 6, 1977. This notice encompasses a "plain statement of the matters asserted" as required by § 9–4–107(b)(iv), W.S.1977, and there was compliance with the Commissioner's own rules requiring a statement of the facts in plain language. We hold that there was no violation of due process requirements insofar as the notice of hearing is concerned.

 We hold also that the Verex hearing in April and the later MGIC hearing were conducted in such a way as to be constitutionally and statutorily fair hearings. Both parties participated to the ex-

tent that they deemed desirable in their respective hearings. There was no attempt made to inhibit testimony of witnesses or argument of counsel, and all pertinent testimony was introduced. The parties were cognizant of the issues and the position of the insurance department. While the claim is made that the Commissioner was prejudiced and biased, the record discloses that he participated patiently in hearing lengthy testimony and arguments of counsel, and after that issued a detailed summary of his findings and conclusions. We have held that it is the burden of parties such as Verex and MGIC to establish any improprieties on the part of a member of an administrative board. *Board of Trustees, Laramie County School District No. 1 v. Spiegel*, Wyo., 549 P.2d 1161 (1976). Prior to the presentation of evidence counsel for MGIC examined the Commissioner with respect to bias. The record of that examination leads us to the conclusion that the burden of showing disqualification was not met. Furthermore, the record in each case fails to disclose any motion by appellants to have the Commissioner disqualified. This failure amounts to a waiver of any right of review on the subject. *Bower v. Eastern Airlines*, 214 F.2d 623 (3rd Cir. 1954); *Thompson v. City of Long Beach*, 41 Cal.2d 235, 259 P.2d 649 (1953).

■ In connection with the hearing process, it appears that the question of burden of proof was a troublesome one in both of these cases, and there was considerable argument about the point. This is not a matter that has been considered by this court, but decisions from other states are helpful in its resolution. We conclude that the proper rule is that in the case of a new filing of a policy form and rates the burden of proof rests upon the party making the filing. Conversely, once the filing has become effective there arises a presumption of validity, which then makes it the burden of anyone (including the Commissioner) complaining against those rates to show that they are wrong. *Massachusetts Medical Service v. Commissioner of Insurance*, 346 Mass. 346, 191 N.E.2d 777 (1963); *Insurance Services Office v. Whaland*, supra; *In-*

*surance Department v. City of Philadelphia*, 196 Pa.Super. 221, 173 A.2d 811 (1961). Our statutory scheme, particularly that portion set forth in § 26–15–112(b) and (c), is consistent with these rulings of other courts. Consequently the burden of proof rests upon the Commissioner.

We add a caveat with respect to further hearing. It certainly is possible that the allocation of the value factors which we have previously described may be a very troublesome evidentiary matter. It should be clear to the parties that upon further hearing the Commissioner will have the burden of proof as to the allocation of charges for mortgage guaranty insurance among these factors, or alternatively the burden of proof of showing that there is no value with respect to the opportunity to obtain a loan or the opportunity to reach the secondary market.

■ There is one matter peculiar to the Verex proceeding which requires further comment and which well could be an appropriate ground in and of itself to reverse that judgment. In that record, in a somewhat argumentative statement supporting the Commissioner's conclusion that the assessment of the first-year premium which is disproportionate to the risk being assumed and the assessment of the same renewal premium for each and every year in which coverage is continued is unfairly discriminatory, the Commissioner used the following language:

"It is an accepted practice in the casualty area to reflect certain acquisition costs in the first year premium, but this does not justify the assessment of a premium which, in some instances, is four times as much for the first year of coverage as it is for the second year of coverage or any year thereafter (nor does it explain why the first year premium to insure a loan with a loan to value ratio of under 80 percent is the same as the second year premium, while the first year premium to insure a loan with a loan to value ratio of 95 percent with a 25 percent option is four times higher than the second year

premium). *At any rate it would seem that the minimum premium retention of $50 ($10 for renewals) is more than adequate to enable the respondent to recoup any acquisition costs which may otherwise be lost as a result of cancellation."* (Emphasis added).

In a subsequent conclusion of law the Commissioner rules that the minimum premium retention of $50 on certificates cancelled during the first year of coverage is excessive and unreasonable. We do not perceive how the Commissioner can justify one conclusion of law in part by the minimum premium retention of $50 and then conclude that the minimum premium retention of $50 is excessive and unreasonable. The inconsistency in this approach is obvious.

We have noted above the justification for the Commissioner to proceed in adjudicatory fashion to establish standards as an alternative to the adoption of rules. This option invokes the principles of *Tri-State Generation and Transmission Association, Inc., v. Environmental Quality Council*, Wyo., 590 P.2d 1324 (1979), in which we noted that a requirement of providing a statement of reasons for the adoption of a rule is tied to the power of the court to review the actions of the agency to determine if they are arbitrary, capricious or characterized by an abuse of discretion. We then noted that this ground for review calls for an examination of whether the agency's decision is based on a consideration of relevant factors and is rational. The conflict between the justification for one conclusion in this record and a different conclusion of law does not satisfy the requirement of rationality. Since the order of the Commissioner was justified in the conjunctive based upon all of the conclusions of law, we hold that the conclusion of law relating to the minimum premium retention of $50 being excessive and unreasonable is inconsistent with the justification for the earlier conclusion of law, and both may not stand. It follows that the Commissioner's action in part was premised upon an impermissible conclusion, and since we cannot determine whether the Commission-

er would have reached the same result absent such a conclusion of law, the Verex order for that reason would require re-evaluation.

The respective judgments of the district court affirming the action of the Commissioner in these instances are reversed, and the cases are remanded to the district court with instructions that they be remanded to the Commissioner of Insurance for the State of Wyoming for further proceedings in conformity with these directions. In the further proceedings the Commissioner should proceed to determine the amounts of the premium costs which are fairly allocable to the value component of the opportunity to receive a mortgage loan; the value component of the opportunity to participate in the secondary home mortgage loan market; and the pure insurance feature of the mortgage guaranty insurance. The Commissioner then should proceed with a determination as to whether the proportion of the cost properly allocable to the insurance feature of the mortgage guaranty insurance costs contravenes the standards developed upon the basis of the statutory requirements.

McCLINTOCK, Justice, Retired, dissenting, in which RAPER, Justice, joins.

I disagree with the majority's handling of this case. They impose upon the Insurance Commissioner the requirement that he take into consideration certain "value factors" which attach to utilization of mortgage guaranty insurance. What this boils down to is that the Commissioner, when reviewing rate structures, must evaluate, consider, and weigh the benefit the citizenry of this state receives from the availability of the insurance against the inequities in the proposed rate structure. Accordingly, if the withdrawal of the insurance carrier from the state (the assumption is made no other carrier would step forward and replace the departing carrier) would be to the state's detriment, then presumably the majority imposes the duty upon the Commissioner to approve the rate structure. The Commissioner must decide whether the state is

better off with the insurance in the proposed package or without it altogether.

This approach is clearly legislative. This is obvious from the failure of the opinion to cite authority supporting the imposition of this requirement. The majority says that "[t]he Commissioner should consider relevant factors other than specified factors enumerated in a statute. * * *" From that the majority makes the quantum leap that these "value factors," a phrase manufactured from thin air, are relevant to the question of whether the rates are "excessive, inadequate or unfairly discriminatory." Section 26–14–105(a)(iv), W.S.1977.

The majority's discussion of the state's need for mortgage insurance belies the judicial cloak worn by them. Clearly the opinion is the product of a legislative concern that if the Commissioner is allowed to revoke the rate structure, the insurance carriers may in fact withdraw from the state and hurt the housing industry. It is often difficult for a court to operate in a vacuum, to consider only the law, and sometimes when questions are otherwise too close to call, public policy should be considered. But here where the law is clear or at least had been clear (in no other case arising from actions taken by either the Insurance Commissioner or the Public Service Commission has the court found that these "value factors" must be considered, though now it would appear that they must since these factors have been ruled relevant to questions concerning whether rates are excessive, inadequate, or unfairly discriminatory) the court has, out of fear that the legislature unwisely granted the Insurance Commissioner too much power, in effect enacted an amendment to the Wyoming statutes imposing upon the Commissioner the duty to consider these "value factors."

Of course, the majority did include the disclaimer that "the Commissioner might conclude that the value was nil. * * *" But after several pages of the court saying that the value was not nil, what does that sentence mean? It means that if the Insurance Commissioner does find the "value factors" to be nil, the case will be up here

again as will all other cases in which the Commissioner rejects a rate structure and discounts the "value factors" as minimal. It will soon be our task to determine what these "value factors" are worth, and whether the Commissioner adequately considered them and we will be in the insurance regulation business.

Not only do I believe that the rationale for the majority's reversal was erroneous, but I also am convinced that these cases should be affirmed. Accordingly, I will address several issues not reached by the majority.

The loss experience of the entire mortgage guaranty industry for the last decade has been approximately 20 percent of premiums earned. MGIC, which writes over 40 percent of all mortgage guaranty business, has earned some $323,000,000 in premiums on a nationwide basis since 1971 and has incurred losses of some $63,000,000 amounting to a nationwide 19.75 percent loss ratio. Verex has experienced a nationwide loss ratio of 21.60 percent loss ratio for the past six years. MGIC and other companies did incur heavier than normal losses in 1974 and 1975, probably because of the nationwide recession. Losses in 1976 and 1977, however, declined significantly from the two previous years.

Since 1971 all mortgage insurers doing business in Wyoming have issued some 6,700 policies insuring $188,000,000 in Wyoming loans. These companies have earned premiums from those policies totalling $1,700,000. During this time only two claims have been paid in the state: In 1971 a claim was paid for $2,000 and in 1973 another claim was paid for $5,000. MGIC has had a loss ratio of .67 percent for the last six years in this state and Verex has had a loss ratio of .61 percent for that same period. This compares with the average loss ratio of .58 percent for all of the mortgage guaranty insurers transacting business within the state. The Commissioner has "noted that these rather modest losses were incurred during the greatest period of nationwide economic turbulence (1971–1976) in the last forty years."

Other Rocky Mountain states have also experienced significantly lower losses than states located in other areas of the country. The total loss ratio experience during the years 1971 through 1976 in all of the states for all of the companies licensed to do business in Wyoming varies from a high of 58.5 percent in Georgia to a low of .58 percent in Wyoming. Other states having high ratios are Arizona, 48.6 percent; Florida, 35.02 percent; Mississippi, 32 percent; Nevada, 48.96 percent; New Jersey, 41.36 percent; and New York, 47.18 percent. Other states having a low ratio are Alaska, 2.16 percent; Hawaii, 3.8 percent; Montana, 3.84 percent; New Mexico, 3.19 percent; and South Dakota, 8.01 percent. Ratios for other states in this geographical region are Colorado, 17.45 percent; Idaho, 5.03 percent; Nebraska, 8.31 percent; North Dakota, 9.8 percent; and Utah, 7.89 percent.

## THE COMMISSIONER'S DECISION AND THE ATTACK THEREON

Despite this wide variation in the average loss ratios experienced by the companies in the different states, none of the companies doing business in Wyoming has differentiated its rates between the areas of greatest and lowest losses.[1] This lack of differentiation was the principal focus of the Commissioner's rejection of the rates. In his order of October 4, 1977, which substantially repeated his order of May 6, 1977, he held:

"* * * [T]he premium rate schedule utilized by the Respondent in the State of Wyoming is excessive; and

"* * * the benefits provided by the Respondent to Wyoming property owners are unreasonable in relation to the premium charged; and

"* * * the failure of the Respondent to differentiate its premium rate schedules between those areas of the country which have produced the greatest losses and those areas of the country, such as Wyoming, which have incurred the fewest losses, discriminates unfairly against premium-paying Wyoming residents; * * *"

The Commissioner also held the rates objectionable on other grounds:

"* * * [T]he assessment of a first year premium which is disproportionate to the risk being assumed and the assessment of the same renewal premium for each and every year in which coverage is continued is unfairly discriminatory against premium-paying Wyoming residents; and

"* * * the premium assessed by the Respondent is not reasonable in relation to the benefits provided to premium-paying Wyoming residents, when the principal balance of the loan decreases to the point where the appraised value of the property exceeds the principal balance of the loan by twenty-five percent; and

"* * * the practice of providing that all premiums received become fully earned upon payment of a claim is in violation of law; and

"* * * the minimum premium retention of $50 by the Respondent on certificates cancelled during the first year of coverage is excessive and unreasonable;"

On the basis of his findings and conclusions, the Commissioner ordered withdrawn the previous approval of the two companies' rate schedules and policy forms, effective as of June 6, 1977.[2] After consideration of the record of the hearings before the Commissioner and briefs of the parties, the district court affirmed the decisions of the Commissioner, except that retroactive operation of the order of October 4 to June 6 was eliminated, as were directions in both orders that the companies file new rates. At no time

1. This practice is quite different from other casualty insurance such as fire and automobile where the premiums will vary considerably as between different areas. Appellants, of course, claim that there are material differences between mortgage guaranty insurance and other forms of casualty insurance, the merits of which claim are material to our disposition of the appeal.

2. This was the date upon which the Commissioner's withdrawal of approval of Verex's rates had been effective and the Commissioner was trying to place his treatment of MGIC and the other companies in line with that order. Retroactive effect of any order was eliminated by the district court and no objection thereto has been made.

did the Commissioner attempt to fix the rates that should be charged. His orders contained an extensive discussion of the issues in the case, and the district court generally found that the orders were not objectionable under the provisions of § 9–4–114(c), W.S.1977,[3] relating to the scope of judicial review of administrative orders.

MGIC sets forth three propositions which it believes require setting aside the Commissioner's order: (1) that MGIC was not afforded substantive or procedural due process; (2) the Commissioner's actions are based on an overbroad delegation of legislative authority, either improperly assumed by the Commissioner or unconstitutionally granted by the legislature; and (3) the Commissioner's order imposes an unacceptable burden on interstate commerce.

Verex states five main propositions with eight subpropositions. It contends: (1) that failure of the Commissioner to adduce evidence of excessive profits resulted in action that was violative of due process; (2) that to limit the underwriting pool to Wyoming is violative of due process and the supremacy clause of the federal constitution; (3) that because of lack of specificity of the applicable statute, it represents an unlawful delegation of legislative power; (4) when statutes are vague, due process requires the agency to promulgate standards to insure fairness; and (5) that the action of the Commissioner must be set aside for want of proper notice in the initiation of the proceedings.

I am satisfied with the majority's treatment of the procedural due process and burden of proof questions. However, I believe the following issues need to be addressed.

1. Do the applicable statutes set up proper standards so that there has not been an improper delegation of the legislative power; and if so, has the Commissioner exceeded the powers delegated to him?

2. Was there substantive due process?

3. Do the Commissioner's actions in these cases impose an unacceptable burden on interstate commerce?

3. Revised in § 9–4–114(c), W.S.1977, Cum. Supp. 1981.

4. Miscellaneous.

I

## EXISTENCE OF PROPER STANDARDS

As has been previously pointed out, § 26–15–113(a)(v), W.S.1977, permits disapproval of policy forms if the "rates or classification are excessive, inadequate or unfairly discriminatory." However, this section is not the only one pertaining to the review of rates. Chapter 14 of Title 26, entitled "Rates and Rating Organizations," sets forth the factors which shall be considered by the Commissioner in his review of rates. I find no conflict in the two chapters and consider Chapter 14 as pertinent to any review, whether it be made at the time of the original submission of rates or in connection with some inquiry requested by a citizen or on the Commissioner's own motion. The first section of Chapter 14, § 26–14–101, W.S.1977, declares the purpose of the chapter to be "to promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate or unfairly discriminatory * * *." Section 26–14–105(a), W.S.1977, then directs:

"(a) All rates as to casualty and surety insurance shall be made in accordance with the following provisions:

"(i) Due consideration shall be given to past and prospective loss experience within and outside this state, to catastrophe hazards, if any, to a reasonable margin for underwriting profit, to past and prospective expenses both countrywide and those specially applicable to this state, and in the case of participating insurers to policyholders' dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members or subscribers;

"(ii) The systems of expense provisions included in the rates for use by any insurer or group of insurers may differ

from those of other insurers or groups of insurers to reflect the requirements of the operating methods of any such insurer or group with respect to any kind of insurance, or with respect to any subdivision or combination of insurances for which subdivision or combination separate expense provisions are applicable;

"(iii) Risks may be grouped by classifications for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. Such standards may measure any difference among risks that can be demonstrated to have a probable effect upon losses or expenses;

"(iv) *Rates shall not be excessive, inadequate or unfairly discriminatory.*" (Emphasis added.)

Appellants argue at some length that these statutes constitute an improper delegation of power from the legislature to the Commissioner. MGIC cites, among other cases, *Montana Milk Control Board v. Rehberg*, 141 Mont. 149, 376 P.2d 508, 515 (1962), where it is said that:

"* * * If the legislature fails to prescribe with reasonable clarity the limits of power delegated to an administrative agency, or if those limits are too broad, its attempt to delegate is a nullity."

Verex appears to recognize that some omissions in detail in the delegating statute may be filled in by the administration agency, citing *Fook Hong Mak v. Immigration and Naturalization Service*, 435 F.2d 728, 730 (2nd Cir. 1970). There it is said that where the legislative body has delegated discretionary power without meaningful standards, the " '* * * administrators should develop standards at the earliest feasible time, and then, as circumstances permit, should further confine their own discretion through principles and rules.' " Both appel-

lants contend that essential standards were not prescribed by the statute or rule or regulation of the Insurance Commissioner to act as guides in determining whether proposed insurance rates were "excessive, inadequate or unfairly discriminatory." The Commissioner contends that the terms used do provide a workable standard that can be applied in the examination of any insurance company's proposed rates.

The question of whether standards should be established through prior rule or regulation or through ad hoc adjudication in the course of consideration of specific problems is not an easy one. I do not believe that this court should attempt to establish any general rule. In *New Hampshire-Vermont Physician Service v. Durkin*, 113 N.H. 717, 313 A.2d 416, 420 (1973), the insurance commissioner had notified interested companies that he intended to review matters affecting rate levels and afforded them an opportunity to be heard. The court observed:

"* * * The fact that he proceeded in an adjudicatory rather than rule making context is irrelevant to the validity of the order in that the Supreme Court has endorsed an agency's choice of the former ad hoc approach under circumstances where it 'may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule.' *SEC v. Chenery Corp.*, 332 U.S. 194, 202, 67 S.Ct. 1575, [1580], 91 L.Ed. 1995 (1947); 1 F. Cooper, State Administrative Law 181–83 (1965); Shapiro, Rule Making as Adjudication,[4] 78 Harv.L.Rev. 921, 926–29 (1965). In this case the commissioner reduced the size of the contingency fund in degrees in order to gather experience data as to the effect of the reduction on the financial condition of Blue Shield. The decision to proceed in this ad hoc fashion lies within his administrative discretion. *SEC v. Chenery Corp.*, supra; 1 F. Cooper, State Administrative Law 180–81 (1965)."

---

4. The title of this very interesting article is more accurately "The Choice of Rulemaking or

Adjudication in the Development of Administrative Policy."

Without foreclosing the possibility that in certain types of cases the establishment of guidelines by rule or regulation may be proper and desirable, I am of the opinion that no such standards could be previously promulgated as to what rates would be excessive, inadequate or unfairly discriminatory. Such determinations by an insurance commissioner must proceed and be reviewed on an ad hoc basis. If there was indeed a necessity for the Commissioner by rule or regulation to establish special standards by which to weigh each insurance company's rate schedule, it has been neglected throughout the history of insurance regulation in the state of Wyoming. I can find no indication that insurance commissioners have adopted such rules or regulations as to any type of insurance sold in this state, yet it appears that companies have uniformly submitted their rate schedules which have been approved or disapproved by the commissioner of insurance. Our statute appears to be virtually identical with regulatory statutes of many other states. Appellants have cited, and I have found, no cases from other jurisdictions holding that an insurance commissioner was required to adopt rules and regulations more specifically defining the terms in question. This seems to me to indicate that, at least in fields of insurance other than mortgage guaranty insurance, there has been no difficulty in applying the requirements of the statute that the rates not be "excessive, inadequate or unfairly discriminatory" to the facts of each proposed rate schedule.

*State ex rel. Wisconsin Inspection Bureau v. Whitman*, 196 Wis. 472, 220 N.W. 929 (1928), is pertinent authority to the question whether there has been an improper delegation of power. The questions there considered related both to the constitutionality of the Wisconsin rating law and the powers of the commissioner under that act. The act required each insurance rating bureau to file with the commissioner copies of its articles and by-laws, agreements with members, and its rules and regulations. It also provided that no company should fix a rate "which is unreasonable * * * or which dis-

criminates unfairly between risks of essentially the same hazard and having substantially the same degree of protection * * *" and further that:

> "The commissioner of insurance shall have power, upon the written complaint of any person having a direct financial interest, or upon his own motion, to review any rate fixed by a bureau or insurer for insurance upon any risk or classification in this state, for the purpose of determining whether the same is unreasonable or discriminatory. * * *" 220 N.W. at 931.

The statute gave the commissioner the power, if he found the rate discriminatory, to remove the discrimination, and if he found it unreasonable, to establish a reasonable rate.

The act was challenged in its entirety upon two grounds:

> "* * * First, that it constitutes an unlawful delegation of legislative power; second, that, if it is held to be a delegation of legislative power, the statute erects no standard in accordance with which the discretion of the commissioner of insurance is to be exercised, and vests in him an arbitrary power." 220 N.W. at 936.

The court considered the general power of the legislature to delegate authority and also two questions raised by the rating bureau which appear particularly pertinent to the present case:

> "* * * 2. Lacking a sufficiently definite standard, there is a denial of due process and also an unlawful delegation of legislative power. 3. Is the test of reasonableness a sufficiently definite standard as applied to insurance rates? * * *" 220 N.W. at 932.

In response to the question of lack of proper standards as to the rules which could be adopted, the court said:

> "* * * Considering the nature of the subject-matter dealt with, it is quite apparent that any attempt on the part of the Legislature to prescribe a standard would result in effect in a prescription of the

rules and regulations themselves; in other words, the subject-matter does not admit of the application of any except the most general standards. * * *" 220 N.W. at 942.

It then went on to show why the delegation of power was not unreasonable:

"While the statute does not in terms provide that the commissioner of insurance shall exercise a sound and reasonable discretion in the disapproval of proposed rules and regulations, that condition is necessarily implied. As has been said many times, in many cases administrative officers or bodies must act, not only within the field of their statutory powers, but in a reasonable and orderly manner. * *" Id. at 942–943.

In making the foregoing statements, the court was considering the general power of the commissioner to adopt rules and regulations but it then proceeded to consider the question of rates review and approval. While the court does not again refer specifically to the question of delegability, it does say:

"* * * The Legislature may undoubtedly vest in the commissioner of insurance power to determine whether rates are unreasonable and discriminatory, and, if he shall find them to be unreasonable and discriminatory, power to establish a reasonable rate.[5] In the case cited, the language of the statute sustained was as broad and indefinite as is the language of the statute in this case. * * *" (Footnote omitted.) Id. at 944.

The court then went on to establish the limitations upon the power of the commissioner, who had taken the action he did sometime after a hearing had been held and, as indicated in his decision, without real analysis of the evidence that had been presented in the course of that hearing. The court said:

"* * * The power conferred by the statute must be exercised, however, in accordance with established principles of law. In assuming that he might exercise the power to set aside and fix rates, conferred by the section arbitrarily without a hearing, it is considered that the commissioner of insurance placed an interpretation upon the language of the act which is not at all warranted either by the purpose of the act or by its language. If the act be upheld as interpreted by the commissioner of insurance it confers upon him managerial power rather than the power to regulate. * * *" Id. at 944.

Finally, the court ruled that it was necessary for the commissioner to hold a hearing, receive evidence from both sides and find the facts as established therein. As that court observed:

"The matter of what constitutes a just and reasonable rate for services rendered and risks assumed by insurance carriers is a very difficult, complex and complicated one. In his findings the commissioner of insurance ought to point out for what reasons and in what respects a particular rate is unreasonable or discriminatory. * * *" Id. at 945.

I have already indicated my failure to find any insurance cases holding that the legislative direction to the Insurance Commissioner to determine whether the rates were excessive, inadequate or unfairly discriminatory represented an improper delegation of power because of lack of standards. Other jurisdictions, without discussion of the necessity for standards, have not hesitated to pass upon the actions of the commissioner in his review of insurance rates. The following is not intended to be an exhaustive analysis of all the cases, but in *Insurance Services Office v. Whaland*, 117 N.H. 712, 378 A.2d 743 (1977), the Supreme Court of New Hampshire carefully and exhaustively reviewed the action of the

---

5. Cited is *German Alliance Insurance Company v. Lewis*, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A. 1915C, 1189 (1918). As indicated in *Fire Insurance Rating Bureau v. Rogan*, infra, 4 Wis.2d 558, 91 N.W.2d 372 (1958), the insurance commissioner of that state no longer

has the power to fix the rate. It is conceded in the case at bar that the Wyoming Commissioner's power is limited only to approval or disapproval and the district court, without objection from the Commissioner, eliminated from his order a requirement that new rates be filed.

commissioner and dismissed the appeal. It is notable that the statute therein involved, setting forth the factors to be considered by the commissioner, is in all essential respects virtually identical with § 26–14–105(a)(i) and (iv), W.S.1977. In *Massachusetts Medical Service v. Commissioner of Insurance*, 344 Mass. 335, 182 N.E.2d 298 (1962), the court had no difficulty in reviewing the commissioner's action under a statute which proscribed rates which were "excessive, inadequate or unfairly discriminatory." The same is true of *Long v. National Bureau of Casualty Underwriters*, 209 Tenn. 435, 354 S.W.2d 255 (1961), reh. denied (1962). In the Massachusetts case the commissioner was reversed and the cause remanded to him. In the Tennessee case he was sustained.

Thirty years after its decision in *Whitman*, the Supreme Court of Wisconsin, in *Fire Insurance Rating Bureau v. Rogan*, 4 Wis.2d 558, 91 N.W.2d 372, 377 (1958), had before it a statute which permitted the commissioner to disapprove "excessive, inadequate or unfairly discriminatory" rates (these are the same factors that are listed in § 26–14–105(a), supra). The court did not discuss the question of delegability but merely ruled that while it was not the province of the commissioner or the court to fix the proper rates, "the commissioner was justified in determining that the proposed rates as filed did not meet the requirements of the statute. * * *"

I would therefore reject appellants' contentions that the insurance act delegates power to the Commissioner to pass upon rates without providing proper standards for his decision. Having reached that conclusion, I would also conclude that the Commissioner did not act in excess of the powers properly vested in him under the statute to determine whether the rates are reasonable. Whether this determination is legally sustainable presents another question which I shall subsequently address.

## II

### SUBSTANTIVE DUE PROCESS

Counsel for Verex state as one of their arguments that "[t]o limit the underwriting risk pool to Wyoming is arbitrary, violative of equal protection and due process * * *." Counsel for MGIC states that "[s]ubstantive due process guarantees that property will not be taken for arbitrary reasons * * *" and contends that:

"* * * [C]ommon sense as well as legalistic reading of the record in this proceeding dictate the conclusion that the cumulative impact of the Commissioner's actions and conduct deprived MGIC of its legally protected due process rights."

It is said in 16A Am.Jur.2d, Constitutional Law, § 807, at pp. 958–959, that "[d]ue process is an elusive concept; its exact boundaries are undefinable, and its content varies according to specific factual contexts. * * *" There appear to be two types of due process, procedural and substantive. Procedural due process "relates to the requisite characteristics of proceedings looking toward a deprivation of life, liberty, or property. * * *" Id., § 813, p. 967. This means, according to the test, that there must be notice, opportunity to defend, and the deprivation must be resolved in a manner consistent with essential fairness. But the whole concept of due process:

"* * * reaches those situations where the deprivation of life, liberty, or property is accomplished by legislation which, by operating in the future, can, *given even the fairest procedure in application* to individuals, destroy the enjoyment of all three. Substantive due process may be roughly defined as the constitutional guaranty that no person shall be deprived of his life, liberty, or property for *arbitrary reasons,* such a deprivation being constitutionally supportable only if the conduct from which the deprivation flows is proscribed by *reasonable legislation* (that is, legislation the enactment of which is within the scope of the legislative authority) *reasonably applied* (that is, for a purpose consonant with the purpose of the legislation itself). * * *

"It has been said that protection from arbitrary action is the essence of substan-

tive due process, and similarly, that, in substantive law, due process may be characterized as a standard of *reasonableness*, which is similar to the standard or test of '*rational grounds*' used in determining a claim of unequal protection of the laws. * * *" (Footnotes omitted and all emphasis added.) Id., § 816, pp. 978–979. The key words in all this are "arbitrary" and "reasonable" and the fact that compliance with even the fairest procedure will not save the legislation or administrative action if it is in other respects arbitrary or unreasonable should not be forgotten.

While I have previously indicated my agreement with the majority that the essential requirements of procedural due process have been complied with, I still must consider whether there has been reasonable legislation, reasonably applied. Appellants do not contend that their business is one that should be free of all restraint;[6] they appear to concede their amenability to Wisconsin law although from much of the presentation it would appear that they might prefer regulation under federal law. The question, then, is upon what basis is regulation by the state of Wyoming conditioning the insurance companies' right to do business in this state upon approval of their rate structure to be considered an arbitrary exercise of power outside the scope of proper legislative action? I have found none; such a theory would seemingly be contrary to the whole concept of regulation of insurance companies by the states in which they do business.

While appellants seek the right to do business in Wyoming, they deny the right of this state to impose any regulation or control upon their activities. I find nothing in the nature of the mortgage guaranty business that justifies a lack of local regulation. The purpose of the legislation conditioning an insurance company's right to do business within the state upon the requirement that their rates be approved as reasonable by the legislative delegate, the Insurance Commissioner, is obviously to protect Wyoming citizens from excessive or unfairly discriminatory rates. Such purpose is legislatively proper. The statute here effecting that purpose is not arbitrary and does not deprive appellants of property without due process of law.

Given the power of the legislature to regulate these companies and given the proper grant of that supervisory power to the Insurance Commissioner, the question left is whether the Commissioner has sought reasonably to protect the rights of Wyoming citizens as directed by the legislature. That is, has he acted with a purpose consonant with the purpose of the legislature? In considering this question, I must note the frequently announced principles which govern this court's review of the validity of delegated administrative action. As was stated by this court when reviewing the state financial board's actions in *Stockmen's Bank and Trust Company v. Financial Institutions Board*, Wyo., 616 P.2d 1273, 1277 (1980):

"* * * The agency's decision comes to this court wearing a presumption of legality and validity, and we may not substitute our judgment for that of the administrative body entrusted by the legislature to approve bank charters. [Citations.] [7] The burden is on the appellant to establish that the administrative agency has acted contrary to law. [Citations.] We cannot lightly disregard the credibility given witnesses by the administrative body. [Citation.] The Protestants are aware of and cite precedent of this court, with which we continue to agree, to the effect that when we examine the evidence to determine whether it is substantial enough to support a finding of fact, it

---

6. We take it to be too well settled to require extensive citation of authority:

 "* * * [T]hat the business of insurance is one that is affected with a public interest, and that it is a proper subject of regulation and control by the state by virtue of the exercise of its police power, in the interest of public convenience and the general good of the people. * * *" (Footnotes omitted.) 43 Am.Jur.2d, Insurance, § 52, pp. 108–109.

7. The principles are equally applicable to agency action passing upon insurance filings and rates.

must be of such relevancy as a reasonable mind might accept as adequate to support a conclusion. * * *"

Cases more specifically in point from other jurisdictions involving statutes virtually identical with our § 26–14–105(a), W.S.1977, include *Pack v. Royal-Globe Insurance Companies*, 224 Tenn. 452, 457 S.W.2d 19 (1970), where the court, quoting from the earlier case of *Long v. National Bureau of Casualty Underwriters*, supra, 354 S.W.2d at 259, said this:

" 'If the Commissioner reached his decision from a consideration of the specified factors enumerated in the Statute, and from other relevant factors, we cannot substitute our judgment and vacate his decision. [Citations.]' "

Similarly, the Supreme Court of New Hampshire, in *Insurance Services Office v. Whaland*, supra, 378 A.2d at 746, had this to say:

"At the outset we note that rate-making is a technical and highly complex process requiring much expertise. * * *

"Rate-making is not a judicial function. 1 R. Anderson, Couch on Insurance § 21:38 (2d ed.1959). Due to its complexity as well as to the determination of the legislature, rate-making is left to the discretion of the insurance commissioner who is a specialist in the field and upon whose expertise we must rely. [Citations.] Due to the expertise required in the field, courts should be reluctant to substitute their judgment for that of the commissioner. * * *"

The repeated requirement of our statute that the Commissioner examine suggested rates of all casualty insurance companies, not excepting mortgage guaranty companies, is that the rates shall not be excessive, inadequate or unfairly discriminatory. Our statute, as do the statutes of many other states, requires that the Commissioner consider past and prospective losses "within and outside this state" and its purpose can only be to protect Wyoming residents against paying an unfair share of the premium burden of any company doing business in this and other states. In Insurance Services Office, supra, one of the paramount disputes concerned the use of national figures as opposed to state figures. The court said:

"The commissioner's written decision reveals that his primary reason for denial of the rate increase is plaintiff's use of countrywide indices and statistics in support of its filing as opposed to data specifically relating to New Hampshire. The commissioner therefore determined that plaintiff's exhibits and expert testimony failed to support its requested rate relief. * * *" 378 A.2d at 743.

The principal findings of the Commissioner that are attacked in this proceeding are that the premium rate schedules of each appellant used in Wyoming are "excessive * * * the benefits provided by the Respondent to Wyoming property owners are unreasonable in relation to the premium charged * * *" and that:

"* * * [T]he failure of the Respondent to differentiate its premium rate schedules between those areas of the country which have produced the greatest losses and those areas of the country, such as Wyoming, which have incurred the fewest losses, discriminates unfairly against premium-paying Wyoming residents * * *."

If in Wyoming the loss ratio upon mortgage guaranty insurance is .58 percent and in Arizona it is 48.60 percent, it necessarily follows that the Wyoming premiums are going to support the Arizona losses. Simplistic reasoning would then require the conclusion that there is a discrimination between the Wyoming and the Arizona mortgagors who must pay those premiums. When the national average loss ratio is 19.75 percent and Wyoming's is .58 percent, it is reasonable to conclude that Wyoming premiums are helping to keep the rates in other states lower than the losses therein. The Wyoming legislature has not indicated that Wyoming should become a part of a national pool for the purpose of underwriting these mortgage guaranty losses. Economists and insurance experts might disagree with this act of self-interest, but the Constitution and pertinent legislation do

not vest this court with the power to pass upon what is the best or the most equitable system. The question of what conditions are to be imposed in doing business in Wyoming is for the legislature. I have already said that the power to pass upon rates was properly delegated to the Commissioner and he is to determine whether proposed rates are excessive, inadequate or unfairly discriminatory. Our statute, like that of many states, requires the Commissioner to consider the past and prospective experience *within and outside the state.* He has done just that, and we cannot say that it was arbitrary action on his part to find discrimination as against Wyoming citizens in the rates imposed by the two companies. I therefore would hold that he has acted in a constitutionally permissible way and his actions have not violated substantive due process.

### III

### BURDEN ON INTERSTATE COMMERCE

For some 74 years, beginning with the decision of the United States Supreme Court in *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1869), it appears to have been considered that the issuance of insurance contracts did not involve interstate commerce, and the regulation of the industry was left to the states. The federal attitude changed somewhat in 1962 and we can summarize that change and the subsequent effect no better than was done by Mr. Justice Douglas in *State Board of Insurance v. Todd Shipyards Corporation*, 370 U.S. 451, 452, 82 S.Ct. 1380, 1381, 8 L.Ed.2d 620, 622 (1962):

"When we held in *United States v. South-Eastern Underwriters Asso.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 [(1944)], that the modern business of insurance was 'interstate commerce,' we put it in a category which Congress could regulate and which, if our prior decisions controlled, could not in some respects be regulated by the States, even in absence of federal regulation. See Frankfurter, The Commerce Clause (1937); Rutledge, a Declaration of Legal Faith (1947).

"Congress promptly passed the McCarran-Ferguson Act, 59 Stat. 33, 15 U.S.C. § 1011, which provided that the regulation and taxation of insurance should be left to the States, without restriction by reason of the Commerce Clause. Subsequently, by force of the McCarran-Ferguson Act, we upheld the continued taxation and regulation by the states of interstate insurance transactions. *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342, 164 A.L.R. 476 [(1946)]." (Footnote omitted.)

As is also pointed out in *Todd Shipyards Corporation*, prior to the *South-Eastern* decision the Federal Supreme Court had given broad scope to local regulation of the insurance business, citing *Osborn v. Ozlin*, 310 U.S. 53, 60 S.Ct. 758, 84 L.Ed. 1074 (1940); and *Hoopeston Canning Company v. Cullen*, 318 U.S. 313, 63 S.Ct. 602, 87 L.Ed. 777 (1943). In both of these cases the insurance company had carried on activities within the state seeking to regulate it. Also mentioned in *Todd Shipyards Corporation* are three cases holding that a particular company, under the specific facts relating to the manner in which it had operated, was not subject to regulation: *Allgeyer v. Louisiana*, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897); *St. Louis Cotton Compress Company v. Arkansas*, 260 U.S. 346, 43 S.Ct. 125, 67 L.Ed. 297 (1922); *Connecticut General Life Insurance Company v. Johnson*, 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673 (1938). In each of these three cases the only contact of the insurance company with the state which was seeking to regulate was that the property insured was within that state. All transactions concerning the issuance of the insurance had been conducted outside that state. In each case the court held that the company was protected by the due process clause of the Fourteenth Amendment to the Federal Constitution from amenability to that state in which the insured property was located. *Todd Shipyards Corporation* presented a similar situation, that is, the insured property was in Texas but the insurance had been negotiated and paid for

outside that state, the policies were issued in another state, and the losses were adjusted and paid outside the state. The case was considered in light of Congress' previous adoption of the McCarran-Ferguson Act, but after analysis of the legislative history of that act the court held that the business was not subject to regulation in the state where the property was regulated, saying:

"So, while Congress provided in 15 U.S.C. § 1012(a) that the insurance business 'shall be subject to the laws of the several States which relate to the regulation or taxation of such business,' it indicated without ambiguity that such state 'regulation or taxation' should be kept within the limits set by Allgeyer, St. Louis Cotton Compress, and Connecticut General Life Insurance decisions.

 \* \* \* \* \* \*

"The power of Congress to grant protection to interstate commerce against state regulation or taxation [citations] or to withhold it [citations] is so complete that its ideas of policy should prevail." (Footnotes omitted.) 370 U.S. at 456, 82 S.Ct. at 1383.

"\* \* \* Here Congress tailored the new regulations for the insurance business with specific reference to our prior decisions. Since these earlier decisions are part of the arch on which the new structure rests, we refrain from disturbing them lest we change the design that Congress fashioned." 370 U.S. at 458, 82 S.Ct. at 1385.

I must emphasize by repetition that the McCarran-Ferguson Act "provided that the regulation and taxation of insurance should be left to the States without restriction by reason of the Commerce Clause. \* \* \*" 370 U.S. at 452, 82 S.Ct. at 1381.

The principles I find in these decisions are that, despite the fact that the business of insurance is considered an interstate business of which the Congress of the United States has the power to assume sole juris-diction over the regulation thereof, by the McCarran-Ferguson Act that jurisdiction has been ceded to the individual states in which a company may engage in business.[8] Further, where a company actually operates a business within a state, the right of that state to regulate the way the company conducts business therein appears unquestioned.

Notwithstanding the fact that both appellants have qualified to do business within the state of Wyoming, have an agent therein, and solicit business therein, they contend that to subject them to regulation by the Wyoming Insurance Department is to impose an unconscionable burden upon interstate commerce. Principally cited as authority are the cases of *Southern Pacific Co. v. Arizona ex rel. Sullivan, Attorney General*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945), and *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959). In neither of those cases was there a specific congressional grant of supervisory power sought to be exercised by the state. Upon the facts of each case the imposition of the state laws was found to be a direct and material burden upon the interstate operations of the companies. In *Southern Pacific Co.* the court said that:

"\* \* \* [E]xamination of all the relevant factors makes it plain that the state interest is outweighed by the interest of the nation in an adequate, economical and efficient railway transportation service, which must prevail." 325 U.S. at 783–784, 65 S.Ct. at 1527.

In *Bibb* it is said that:

"\* \* \* [T]he heavy burden which the Illinois mudguard law places on the interstate movement of trucks and trailers seems to us to pass the permissible limits even for safety regulations." 359 U.S. at 530, 79 S.Ct. at 968.

Hundreds of pages in the transcript of the case at bar are consumed in evidence establishing that mortgage insurance has

---

**8.** I am aware that the concept of doing business within a state renders a foreign corporation more susceptible to exercise of jurisdiction by that state has considerably expanded. This expansion would appear to me to strengthen the right of Wyoming to regulate the business which an insurance company conducts in Wyoming.

created an outside market for mortgages upon Wyoming properties. It is demonstrated that Wyoming is a capital-poor state and needs that outside money in order that its people be able to finance the homes in which they live. There is no doubt that the out-of-state investment in such mortgages is very substantial and of great benefit to our state, but it has not been shown that regulation of the companies providing such insurance, in the same manner and subject to the same restrictions under which other foreign insurance companies operate in Wyoming in other lines of insurance, will materially interfere with that operation. If the writing of the many other forms of insurance, conducted through local agents within the state of Wyoming, even though it may constitute interstate business, is nevertheless to be considered as subject to state regulation under permission of the McCarran-Ferguson Act, appellants have failed to convince me of any distinction in their business that renders them immune from such regulation.[9]

The activities of the appellants are relatively new. No authorities have been cited or found which directly support or deny their argument that they are immune to regulation by this state. That should not prevent a favorable conclusion if analysis and argument demonstrate that there are cogent reasons why they must be declared free of state regulation. Appellants have presented no such argument and I cannot conclude upon my own analysis of the case. I would not hold that the companies are exempted from regulation under the laws of Wyoming merely because the business in which they engage is interstate.

IV

MISCELLANEOUS

Neither party appears to attack the order of the Commissioner specifically on the grounds cited in § 9–4–114(c), supra, and Rule 12.09, W.R.A.P., setting the basis upon which administrative action will be reviewed. The Commissioner's Conclusions 3 to 6 state objections to the rates as filed by the companies which have not been specifically attacked. Seemingly appellants object to them only as they come within the scope of allegedly improper state regulation. It is asserted frequently and at length throughout the briefs that the action of the Commissioner was arbitrary to the extent of constitutional invalidity. But I believe that the law was proper and that the Commissioner was within his delegated authority and properly proceeded in his determination that the rates were discriminatory. It is not this court's task to judge the economic wisdom of his decision. We should not be considering the threats made by appellants that they will pull out of the state altogether if we don't reverse. It is not our province to determine whether insurance of this kind should best be regulated on a national basis. The legislature imposed certain conditions for admission of any foreign insurance companies, including mortgage guaranty insurers, to do business within the state. The Commissioner has in good faith and on the basis of substantial evidence withdrawn his approval of the rate structure. If the law should be changed, that is for the legislature. As I said earlier, the majority's ruling amounts to legislation.

Verex has individually complained that the Insurance Department failed to adduce evidence of excessive profits on its part. It claims that the department urged that Verex's profits were excessive because of recent low loss experience in Wyoming. While excessive profits could be a factor to be considered by the Commissioner in passing upon the validity of a company's rate structure, I do not construe the Commissioner's findings and conclusions as going to the question of profits. The contention

9. The majority's approach which imposes an obligation upon the Commissioner to consider the state's need for the insurance carrier leaves me with one question: Does this requirement apply across the board? Must the Commissioner consider this when reviewing rates for auto insurance? How about the PSC when reviewing electrical rates? I suppose the answer depends upon where the majority found its requirement: whether it is statutorily, constitutionally, or judicially imposed.

that the Commissioner equates low loss experience with excessive profits is therefore based on an improper assumption. What the Commissioner was concerned with, as indicated throughout the many pages of testimony and exhibits, is that Wyoming mortgagors were being discriminated against because even though through some six years the loss ratio in Wyoming had been greatly lower than in many other states, those Wyoming mortgagors were paying the same premiums as the mortgagors in the high-loss states. This the Commissioner considered unfair and in violation of the principle of proportioning the cost of the insurance to the risk involved. I repeat that he has not attempted to fix the rates. I would not say that his decision was the only one that could have been entered. I merely say that it was authorized by law, that it was not arbitrary, and as was said in *Fire Insurance Rating Bureau*, supra, 91 N.W.2d at 377:

"* * * The ultimate determination of the commissioner is supported by substantial evidence in view of the entire record; he did not proceed in excess of his statutory authority; his determination and order was not arbitrary and capricious, and does not deprive the members and subscribers of the bureau of their property without due process of law."