756 P.2d 558

**NATIONAL COUNCIL ON COMPENSA-
TION INSURANCE,
Petitioner–Appellant,**

v.

**NEW MEXICO STATE CORPORATION
COMMISSION, Eric Serna, John El-
liott, Jimmie Glenn, Members, acting as
the State Insurance Board, and the Su-
perintendent of Insurance, Vincente
Jasso, Respondents–Appellees.**

No. 16310.

Supreme Court of New Mexico.

May 10, 1988.

Rehearing Denied June 16, 1988.

Rodey, Dickason, Sloan, Akin & Robb, P.A., Victor R. Marshall, Cameron Peters, Albuquerque, for petitioner-appellant.

Christopher Carlsen, Carol Baca, Asst. Attys. Gen., Santa Fe, for respondent-appellee Corporation Com'n.

Steven Durkovich, Albuquerque, for amicus curiae NM Trial Lawyers Assn.

## OPINION

RANSOM, Justice.

On December 23, 1985, the Insurance Board disapproved a workers' compensation insurance premium increase that was to go into effect January 1, 1986. The National Council on Compensation Insurance (NCCI), which submitted the rate filing, petitioned this Court for review. We declined to accept jurisdiction, and NCCI filed an appropriate appeal of the Board's decision in the District Court of Santa Fe County. *See National Council on Compensation Ins. v. New Mexico State Corp. Comm'n*, 103 N.M. 707, 712 P.2d 1369 (1986). The district court affirmed the order of the Board. NCCI appeals. We affirm.

This appeal is governed by the Insurance Code, NMSA 1978, Sections 59A–1–1 to 59A–53–17 (Orig.Pamp.1984). Article 17 (§§ 59A–17–1 to 59A–17–35) comprises the Insurance Rate Regulation Law, the statutes most specifically applicable to this appeal.

## PROCEEDINGS

NCCI is an official rate service organization. *See* §§ 59A–17–4(B), 59A–17–19. On October 17, 1985, NCCI filed a premium rate increase for all workers' compensation carriers operating in New Mexico. The premium increase applied to all policies issued or renewed during the calendar year beginning January 1, 1986.

On October 31, the Superintendent of Insurance informed NCCI by letter that the Board had hired an independent actuary, Allen Kaur, to review the filing. The Superintendent asked NCCI to cooperate with any request from Mr. Kaur for additional information. The letter also notified NCCI that a hearing had been scheduled to solicit input from employer groups and to allow NCCI to make a presentation of its filing.

On November 15, the Superintendent mailed written notice to NCCI regarding a

December 10 public hearing to receive comment and to give consideration to the rate filing in terms of specific statutory criteria under Section 59A–17–8 and other relevant factors described in the notice.[1] Because the filing was not specifically disapproved within fifteen days of its submission, the filing was treated as having become effective prior to the hearing.[2] Following the December 10 hearing, the Board disap-

1. The notice stated the following:

> PLEASE TAKE NOTICE that an informal public hearing will be held on December 10, 1985, to receive written and oral comments of interested persons concerning proposed workmen's compensation rate increases.
>
> The proposed increases filed with the Superintendent of Insurance average 37.1% and range up to increases of approximately 60% over current rates for individual classes of employees. The rate increases will apply to all Workmen's Compensation policies issued in New Mexico on or after January 1, 1986, except for policies issued to public entities which policies are exempted pursuant to rule of the Superintendent.
>
> The hearing will focus on whether the proposed rates are excessive, inadequate or unfairly discriminatory. Rates are deemed to be excessive if they are likely to produce a profit that is unreasonably high in relation to the risks to be covered, or if expenses are unreasonably high in relation to services rendered. Rates will be deemed inadequate if they are clearly insufficient, together with the investment attributable to them to sustain projected losses and expenses. Unfair discrimination exists if one rate fails to reflect equitably the differences in expected losses and expenses in comparison with another rate in the same class. Further consideration will be given in the hearing to the specific issues described in Section 59A–17–8 NMSA 1978 and other applicable law.
>
> Comments will be received in both written and oral form. Written comments should not exceed twenty (20) pages in length, must be received not later than the date of hearing, and should be mailed to the Superintendent of Insurance. * * *

2. A filing must be on file for a waiting period of 15 days before it becomes effective. § 59A–17–10(C). (The effective date of the "filing" is distinguished from the effective date of the "premium rate.") If, because the insurer has not included supporting manuals and plans required to be filed or the insurer has not released other information upon which the insurer supports the filing, the Superintendent requires the insurer to furnish additional information, then the fifteen-day waiting period does not commence until the information is furnished. § 59A–17–10(A). Within the waiting period, the Superintendent may disapprove the filing by written notice specifying the failure of the filing to meet requirements and stating the filing shall not become effective. § 59A–17–14(A). No hearing is necessary. After a filing has become effective, disapproval is governed by Section 59A–17–14(B), which provides:

> If at any time subsequent to the applicable review period provided for as to a workmen's compensation insurance filing the superintendent finds that a filing does not meet the applicable requirements of this article, he shall, after a hearing upon written notice specifying the matters to be considered at the hearing to every insurer and rate service organization which made such filing, issue an order specifying the respects in which he finds that the filing fails to meet such requirements and stating when, within a reasonable period thereafter, such filing shall be deemed no longer effective. * * *

In adhering to Subsection (B) rather than Subsection (A) of Section 59A–17–14, both the Board and the district court were guided by procedural requirements which respondents now argue to be inapplicable to the facts in this case. It may even be argued that the Superintendent misconstrued the law, when, in his letter of October 31, having determined that the review of the filing within 15 days of its receipt was not possible, he extended the waiting period only an additional 15 days. In that letter, the Superintendent requested that NCCI cooperate with the Board's independent actuary and furnish him with any additional information he may need to complete his review. This language arguably satisfied the statutory intention that:

> When a filing is not accompanied by the information upon which the insurer supports the filing, and the superintendent does not have sufficient information to determine whether the filing meets the requirements of those provisions of this article applicable as to workmen's compensation insurance, he shall require the insurer to furnish the information upon which it supports the filing, and *in such event the waiting period shall commence as of the date such information is furnished.*"

§ 59A–17–10(A). If supporting information requested by the Superintendent is not forthcoming, a filing clearly could be disapproved under Section 59A–17–14(A) on the grounds that the furnishing of information within a reasonable period of time is mandatory.

While we could consider the disposition of this case on that basis, *see Conwell v. City of Albuquerque,* 97 N.M. 136, 637 P.2d 567 (1981) (while a reviewing court may not substitute its judgment for that of an administrative decision-maker, it may correct the decision-maker's misapplication of the law), we choose to rest our decision on the Board's own assumption that Subsection (B) applied.

proved the rate filing scheduled to go into effect January 1.

## STANDARD OF REVIEW

Section 59A–17–35 governs appeals from an order made by the Board disapproving a rate filing. *National Council on Compensation Ins. v. New Mexico State Corp. Comm'n,* 103 N.M. 707, 712 P.2d 1369 (1986). The district court is required to sustain the administrative action appealed from unless such action is either unlawful, arbitrary or capricious, or not based upon substantial evidence. § 59A–17–35(C). In reviewing the administrative action, the court should give due consideration to the expertise of the Superintendent and the Board. *Id.*

■ In *Duke City Lumber Co. v. New Mexico Environmental Improvement Board,* 101 N.M. 291, 681 P.2d 717 (1984), this Court held that for purposes of reviewing administrative decisions the substantial evidence rule is expressly modified to include whole record review. *Id.* at 294, 681 P.2d at 720. Under whole record review, the court views the evidence in the light most favorable to the agency decision, *Wolfley v. Real Estate Comm'n,* 100 N.M. 187, 668 P.2d 303 (1983), but may not view favorable evidence with total disregard to contravening evidence. *New Mexico Human Servs. Dep't v. Garcia,* 94 N.M. 175, 608 P.2d 151 (1980).

■ To conclude that an administrative decision is supported by substantial evidence in the whole record, the court must be satisfied that the evidence demonstrates the reasonableness of the decision. No part of the evidence may be exclusively relied upon if it would be unreasonable to do so. The reviewing court needs to find evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency. *See Sandoval v. Dep't of Employment Sec.,* 96 N.M. 717, 634 P.2d 1269 (1981).

■ On appeal to this Court, the review of an administrative decision is the same as before the district court. *Jimenez v. Department of Corrections,* 101 N.M. 795, 689 P.2d 1266 (1984). However, our review requires a two-fold analysis. *Tapia v. City of Albuquerque,* 104 N.M. 117, 717 P.2d 93 (Ct.App.1986). Ultimately, we must decide whether the district court was correct in finding substantial evidence to support the Board's order. In making that decision, we must independently examine the entire record. *Id.* at 120, 717 P.2d at 96.

NCCI claims numerous separate errors of law and complains that many of the Board's findings are not supported by substantial evidence on the record as a whole. We address its points seriatim, together with relevant substantial evidence questions.

## POWERS OF THE BOARD IN RELATION TO ITS SECRETARY

The Insurance Code provides that the Insurance Rate Regulation Law is under the exclusive jurisdiction of the Insurance Board and that it be administered by the Board's Secretary, the Superintendent of Insurance. §§ 59A–3–2, 59A–17–5. All powers relating to state control and supervision of insurance rates and rate practices are under the exclusive control of the Board (§ 59A–2–1), which consists of the chairman and members of the Corporation Commission. § 59A–3–1. Appointed by the Corporation Commission, the Superintendent of Insurance is the chief administrative officer of the Board as well as its Secretary. § 59A–3–3(A). As Secretary, the Board may remove him for cause, and he is automatically removed if the Corporation Commission removes the Superintendent for cause. § 59A–3–3(B). The Secretary certifies the proceedings of the Board under a seal furnished by the Board (§ 59A–3–4), and his general powers as to rules and regulations, enforcement, and otherwise are coextensive with those as Superintendent. § 59A–17–5.

NCCI claims that Section 59A–17–14(B) permits only the Superintendent, not the Board, to make a preliminary finding and then conduct a hearing on a filing. (See

Footnote 2 for text of Subsection (B)). At issue is whether the powers and duties specifically prescribed for the Superintendent under that section are intended by the legislature to be his to the exclusion of the Board itself. In support of its argument that the Superintendent's powers and duties are exclusively his, NCCI submits that the legislature intended a two-tier hearing for any person aggrieved by the Superintendent's action, threatened action or failure to act. Under Section 59A–17–34, any such person is entitled to a hearing before the Superintendent and, if aggrieved by the Superintendent's order on such hearing, or by the Superintendent's refusal to hold the hearing, that person may request a review thereof by the Board.

■ We agree that Section 59A–17–34(A) mandates the Superintendent hold a hearing upon request by a person aggrieved by the Superintendent's act, threatened act, or failure to act, or by any report, rule, regulation or order of the Superintendent (§ 59A–4–15), and that a request may be made for review by the Board of the Superintendent's order after a hearing or refusal to hold a hearing. § 59A–17–34(B). However, we do not agree that the grievance procedure mandates that the Board, which by statute has exclusive jurisdiction over the rate regulation law and the control and supervision of rates and rate practices, cannot, as a body, exercise its powers to examine a rate filing without first allowing its Secretary to act under specific statutory authorization and direction. Unless any intent of the legislature to the contrary be expressly stated, we cannot infer that powers authorized under Section 59A–17–14(B) for the Superintendent could be exercised only by him to the exclusion of the Board.

### PROCEDURAL DUE PROCESS

■ *Notice.* NCCI submits that its due process rights under Article 17 were violated. NCCI contends that the notice provided by the Superintendent lacked the specificity required under Section 59A–17–14(B). This section provides that if, following the applicable review period, the Superintendent determines that a filing fails to meet the requirements of Article 17, "he shall, after a hearing upon *written notice specifying the matters to be considered at the hearing* to every rate insurer and rate service organization which made such filing, issue an order * * *:" (Emphasis added.) NCCI claims that the Superintendent's notice did not sufficiently apprise NCCI of the issues to be addressed during the hearing. To support its contention that the Superintendent's notice was inadequate, NCCI relies primarily upon *Mountain States Telephone & Telegraph Co. v. New Mexico State Corp. Commission*, 90 N.M. 325, 563 P.2d 588 (1977).

The application of *Mountain States* to the case at bar is inapposite. We note initially that under Article XI of the New Mexico Constitution, the Corporation Commission is mandated to establish the rates charged by telephone companies within the state, whereas the Commission acting as the Insurance Board does not establish rates. The Board merely approves or disapproves rate filings.

In *Mountain States*, the Court reviewed a Corporation Commission order of 1973, regarding cost of service pricing in determining telephone rates. In 1975, the Commission relied upon the 1973 order to gauge the reasonableness of a Mountain State's rate proposal. However, the 1973 order evinced no more than an intention to move toward a cost of service principle of pricing at some indefinite time. Therefore, the Court properly ruled that, as required by due process, the order did not constitute a reasonably definite notice of the subject matter attributed to it by the Commission. *Id.* at 340, 563 P.2d at 603.

In contrast to the order in *Mountain States*, NCCI was given specific notice of the hearing's subject matter. The November 15 notice alerted NCCI that the December 10 hearing would focus on whether the proposed average 37.1 percent premium increase was excessive, inadequate or unfairly discriminatory. Further, the notice clarified those terms by adapting the definitions provided under Section 59A–17–6.

More importantly, the Superintendent's notice served a different function than the

order at issue in *Mountain States.* The *Mountain States* order supposedly notified Mountain States of established rate-making methods by which Mountain States was expected to conform its rate proposal. Here, the November 15 notice served to inform all interested parties that written and oral comment would be received at a public hearing to discuss whether the proposed filing was excessive, inadequate or unfairly discriminatory.

NCCI claims that the notice was insufficient because NCCI was not informed prior to the hearing that the Board would request audited premium schedules, investment income data, and calculations based upon an eight to ten-year insurance cycle as opposed to a two-year cycle. NCCI would have this Court conclude that notice under Section 59A–17–14(B) requires the Superintendent to specifically notify the rate maker of all issues which may arise during the hearing. Other than *Mountain States,* the authority relied upon for this proposition is *Woody v. Denver & Rio Grande Railroad Co.,* 17 N.M. 686, 132 P. 250 (1913) and *Transcontinental Bus System, Inc. v. State Corp. Commission,* 56 N.M. 158, 241 P.2d 829 (1952) (where the Court addressed the Commission's improper reliance on evidence adduced outside of the record, and sufficiency of notice was not at issue).

In *Woody,* the Court reviewed a Corporation Commission order requiring the railroad to install a telegraph operator at one of its stations. The Commission issued the order following a hearing whose notice identified the adequacy of station facilities for accommodating passengers as the issue to be addressed. The Court concluded that the order went outside the noticed subject matter because the Commission could only require a telegraph operator for safety reasons and the hearing's notice made no mention of safety as the subject matter. *Woody,* 17 N.M. at 693, 132 P. at 253. Here, the notice clearly identified the subject matter to be considered and the order was consonant with the subject matter addressed.

The November 15 notice satisfied the requirements of Section 59A–17–14(B) and comported with procedural due process. The notice provided NCCI an opportunity to be heard by reasonably informing NCCI of the matters to be addressed at the hearing so that it was able to meet the issues involved. *See Jones v. New Mexico Racing Comm'n,* 100 N.M. 434, 671 P.2d 1145 (1983). The Superintendent mailed written notice to NCCI that specified that the hearing would entail the review of the proposed premium increase under relevant statutory criteria, (see Footnote 1 for text of notice), and provided NCCI twenty-five days for preparation.

We recognize that due process could be denied where statutory notice, although technically adequate, was shown to mislead or prejudice the complaining party. Conversely, if, in addition to statutory notice, a party had actual knowledge of the details to be inquired into at the hearing, that would support the reasonable conclusion that there was no violation of procedural due process. *See North State Tel. Co. v. Alaska Pub. Util. Comm'n,* 522 P.2d 711 (Alaska 1974). Prior to the hearing, Mr. Kaur requested investment income data, standard premium callsheets and schedule rating information. The Superintendent's October 31 letter to NCCI and the requests of Mr. Kaur, along with the November 15 notice, provide substantial evidence to support the district court's finding that NCCI was given adequate notice of the subject matter to be addressed at the hearing.

 *Change in Format of Proceedings.* It is also argued that the Board violated due process by changing the format of the proceedings from an informal information-gathering process to a formal rate hearing. After the hearing started, the Board stated that "we are going to proceed as if this is a formal rate hearing." NCCI submits that this statement represented an abrupt and arbitrary change in the nature of the hearing and that, as a result, it suffered prejudice. *See Medical Malpractice Ins. Ass'n v. Lewis,* 112 Misc.2d 103, 445 N.Y.S.2d 1013 (1981) (where a statutorily mandated

hearing was improperly denied on the basis of prior informal review proceedings).

NCCI maintains that the November 15 notice of an "informal public hearing" induced it to prepare an informal presentation aimed at a lay audience. At the hearing, NCCI presented a non-technical overview using "net earned premium" rather than the more technical "standard earned premium" which it had used in the filing itself. NCCI claims that had it received proper notice of the nature of the hearing it would have made a more detailed presentation using "standard earned premium."

Thirteen days after NCCI filed its rate proposal, the Superintendent requested NCCI to be prepared to furnish additional information and to make a presentation of its filing. Through Mr. Kaur's inquiries, NCCI was made aware that the Board wanted to examine investment income, premium callsheets, and schedule rating data. The "informal" format designation cannot be construed to have limited the subject matter or significance of the proceedings. Although one objective of the hearing was solicitation of public input and a lay audience was to be in attendance, NCCI knew or should have known that its presentation needed to satisfy the regulatory body which had called the meeting to consider the rate filing.

The statement of legal issues submitted for the record by NCCI a week prior to the December 10 hearing supports the reasonable inference that NCCI was aware that the hearing could culminate in the approval or disapproval of its rate filing. NCCI, however, maintained that under the statutes such a hearing could not be conducted by the Board.

> [T]he hearing on December 10 before the [Board] can only be for the purposes of information and discussion, not for approving or disapproving the rates themselves.
>
> If a hearing concerns possible disapproval of rates, then it must be conducted by the Superintendent, not the [Board] * * *. Whatever the review procedures may be, it is clear that the [Board] is not empowered by statute to conduct an initial hearing on a rate filing.

NCCI reiterated its position at the hearing. In response, counsel for the Superintendent expressed a contrary statutory interpretation.[3] Following these statements, a discussion was held off the record; then it was announced that "we are going to proceed as if this is a formal rate hearing." Consequently, NCCI enjoyed the right to introduce evidence, to present its own witnesses, to cross-examine witnesses, and to present legal argument. The notice was quite clear that the rate filing was being considered in terms of statutory criteria and other relevant factors regardless of

---

3. MR. [Commissioner] ELLIOTT: Now, it is your understanding that this commission cannot act in an informal hearing, or is this commission considering your rates today?
MR. MARSHALL [for NCCI]: Mr. Chairman, I will address that in my opening remarks. It is our position that it is a matter of law that the proper forum to consider this rate increase was the superintendent of insurance. He has a specified time in which to act to disapprove the rates or they become effective. It is our position that the hearing today is an informal one to receive comments. That it is not a formal evidentiary hearing, and that it is basically for the purpose of receiving comments. It is our view that the statutes allow the rates to go into effect unless they have been disapproved after a formal hearing. That is our position.
MR. ELLIOTT: Now, Mr. Carlson [sic], you have a reply?

MR. CARLSON [sic]: Yes, Mr. Commissioner, we do. The insurance Board is given plenty [sic]—absolute control over the rate making process, and it is put in charge of it. This is a rate making issue, and specifically, it's put in charge of everything under article seventeen of our new insurance code. Now, article seventeen is the article pursuant to which this hearing is being held. So it is my opinion that the Board or the—that the Board may step in and exercise the superintendent's power in any rate making proceeding in the first instance.
With regard to the need for a formal hearing, the article seventeen doesn't say that a formal hearing is necessary to act on workmen's comp rates. It simply says that a hearing must be held before any rates are disapproved. So it is not—it is our opinion that—it is our position that a formal hearing does not have to be held. As long as the hearing that is held comports with due process, that is enough.

the informal or formal label given the hearing. The point raised by NCCI to the effect that the Board is empowered to do no more than informally receive comments has been addressed above under *Powers Of The Board In Relation To Its Secretary.*

No rule or regulation denigrates an informal hearing under the Code.[4] What is essential to due process is the reasonableness of notice and procedures followed. *McCoy v. New Mexico Real Estate Comm'n,* 94 N.M. 602, 614 P.2d 14 (1980). From the notice received, NCCI had no reason to believe that the labeling of the hearing as informal diminished its obligation to demonstrate that its rate filing satisfied the requirements of Article 17 or that the labeling meant due process would be absent.

Furthermore, although NCCI claims that it was unprepared for both the style and the scope of the hearing, the record indicates otherwise. NCCI presented two expert witnesses to promote its case, which was presented by both out-of-state and in-state counsel. NCCI has demonstrated no actual prejudice as a result of the Board's actions. *See Jones,* 100 N.M. at 436, 671 P.2d at 1147. We find no merit to its argument that its due process rights were violated.

*Time Constraints of Order's Effect.* Under Section 59A–17–14(B), an order disapproving a filing must allow a reasonable period before the filing is deemed no longer effective. The order disapproving the filing was issued on December 23 and was to take effect on December 31. NCCI argues that this eight day period was not reasonable especially because it transpired during the Christmas holidays. NCCI recognizes that the statute does not define "a reasonable period" but maintains that, under the circumstances, four working days was in-

sufficient to either recall the rate change or obtain judicial review of the disapproval.

▇▇▇ The presumption, however, is that the Board's decision was reasonable. *See Garcia,* 94 N.M. at 177, 608 P.2d at 153 (quoting *Quinlan v. Board of Educ. of North Bergen Township,* 73 N.J.Super. 40, 179 A.2d 161 (1962)). Aside from its argument about the holidays, NCCI has shown nothing to rebut that presumption. This Court does not know what premiums were due forthwith on January 1, nor what was needed to be done in four working days to effectuate the Board's order. We note that NCCI could have moved immediately to stay the order and to place in escrow any premiums received after December 31, until a final determination on the Board's order was made by the district court. *See* § 59A–17–35. NCCI also complained it did not have time to cure the defects outlined by the Board in its findings, conclusions and order. However, NCCI was not prohibited from refiling had those defects been cured.

▇▇▇ *Lack of Specificity of Order.* NCCI also claims that the order failed to identify sufficiently the filing's shortcomings. NCCI contends that the Board's order fails to provide guidance to it for future rate filings. NCCI cites *Blue Cross of Kansas, Inc., v. Bell,* 227 Kan. 426, 607 P.2d 498 (1980), for the proposition that an order merely finding fault with a rate filing in general terms of the statute is not sufficient. *See also Nationwide Mut. Ins. Co. v. Commonwealth,* 15 Pa.Commw. 24, 324 A.2d 878 (1974).

In *Blue Cross of Kansas, Inc.,* the Commissioner of Insurance disapproved twenty-one separate rate filings by drafting twenty-one separate letters which gave identical reasons for disapproving each of the twenty-one filings. Each letter contained four

---

4. Sections 59A–4–16(E) and 59A–4–18 provide for informal hearings, to be held in accordance with rules and regulations that may be promulgated in accordance with Section 59A–2–9. There is no record of any specific rules and regulations that govern the administration of informal hearings before the Board or the Superintendent acting as Secretary of the Board. On motion for rehearing, NCCI raises issues of specific application of Rules of Procedure of the New Mexico State Corporation Commission. However, we do not find that these rules were made applicable to the Board or that the hearing before the Board was a Commission hearing to which these rules applied. Accordingly, we have not reached the merits of the arguments made in reference to those rules.

brief conclusional statements. There was no expression of the basic facts upon which the Commissioner premised his decision. 227 Kan. at 434, 607 P.2d at 504.

The Board's findings and conclusions do not suffer from the infirmities present in the Commissioner's letter decisions in *Blue Cross of Kansas, Inc.* The Board's December 23 order detailed the evidence upon which it rested its decision to disapprove the filing. The order was sufficiently specific, if not quite explicit, in giving guidance to NCCI for amending its future rate filings.[5]

## SUBSTANTIVE STANDARDS

■ *Statutory Presumption Under § 59A–17–6.* In addition to allegations of

5. In the Board's findings, conclusions and order, the Board made the following pertinent findings:

8. At the hearing the Council presented charts in support of the Filing which contained information based on Net Earned Premium. The Council's actuary, Mr. Kevin MacAllister, conceded that Net Earned Premium was not an appropriate basis for and was not relevant to this workmen's compensation ratemaking proceeding. Mr. MacAllister stated that only Standard Earned Premium was relevant to the determination of rates in this proceeding.

10. The company "General Expense" percentage and calculations in the filing are based on stock insurance companies. Mr. MacAllister was unable to explain to the Commission's satisfaction why general expenses of insurance companies should not be derived from both stock and mutual companies, particularly when other expenses are derived from both classes of companies.

11. New Mexico permits deviations from Standard Earned Premium on a number of bases, including scheduled rating. Scheduled rating is distinguishable from other types of premium deviations in that it can vary with each and every policy issued.

12. The Superintendent's actuary, Allen Kaur, testified that he had never received a satisfactory verifiable answer to his question as to how the Council assured that schedule rating discounts were converted to Standard Earned Premium. Mr. Kaur explained that this question presented substantial problems in his ability to evaluate the Filing, because without an assured uniform method of conversion, the accuracy of the Standard Earned Premium figure could not be verified. Mr. Kaur stated in response to a hypothetical that the impact of widespread failures to convert scheduled rating discounts to Standard Earned Premiums could result in millions of dollars inaccuracy [sic] and underreporting of the Standard Earned Premium figure used in the Filing.

13. The Council's Mr. Mark Mulvaney acknowledged that no actual audits of companies were being performed to verify that scheduled rating discounts were in fact being properly converted for the 1983 policy year used as a base for the filing. The Insurance Board does not see how the appropriateness of any statistical method can be verified without such an audit.

14. Mr. Allen Kaur stated that he had requested the Standard Earned Premium call sheet from the Council, and that it had not been made available to him. Mr. Kaur stated that this material was needed to verify the Standard Earned Premium used in the Filing.

18. The New Mexico Trial Lawyer's Association actuary, Mr. Robert Lowe, testified that a large portion of the 37.1% average rate increase proposed in the filing was attributable to development factors. The use of development factors is necessitated by the need to use recent loss information which is necessarily incomplete. However, development factors in this Filing were based on only a short time span. According to Mr. Lowe the insurance industry is cyclical, and this should have been, but was not, considered in establishing development factors in the Filing. The current cycle is now seven to eight years long. The development factors used in this Filing are based on a much shorter period of time, *viz* two years, whereas an entire cycle like the current one would be about ten years long.

19. Mr. Lowe stated that the proposed rate increases in the Filing were based only on losses attributable to benefits. Nonetheless, the rate of increase necessitated by benefits alone was applied to company expenses. Mr. Lowe stated that company expenses did not necessarily increase at the same rate as loss payments. Excluding the 37.1% company expense increase would alone reduce the average rate increase requested in this proceeding from 37.1 to 26.6%, according to Mr. Lowe.

21. Insurance company expenses, and general expenses in particular, are not necessarily tied to the cost of benefits. There is no support in the record for an increase in Company general expenses which is exactly proportionate to the projected increases in benefits to be paid out.

23. One witness stated that rate requests should be based only on those companies which are the best performers, not on all companies.

24. No information concerning company investment income was supplied relating investment income to or showing its impact on the filing. The Notice of Hearing specifically stated that investment income would be considered in connection with the adequacy or inadequacy of rates.

procedural errors, NCCI maintains the Board failed to abide by substantive standards for reviewing a filing. Initially, NCCI claims that the Board disregarded the statutory presumption that rates in a competitive market are not excessive. *See* § 59A–17–6. However, this statutory presumption is inapplicable in determining workers' compensation rates. § 59A–17–6(F).

Nonetheless, NCCI maintains that the Board should have recognized the presumptions under Section 59A–17–6 because the November 15 notice quoted verbatim from that section. However, the notice did not quote verbatim but only adapted language from Section 59A–17–6 in order to clarify the terms "excessive" "inadequate" and "unfairly discriminatory." Nowhere within the notice did the Superintendent indicate that the filing would be examined under the standards of Section 59A–17–6, nor would it have been proper under the prohibition of Section 59A–17–6(F) had the Superintendent done so.

 *Investment Income.* NCCI next maintains that the Board improperly demanded investment income data from NCCI. NCCI refused to submit such data because NCCI interpreted Section 59A–17–8, which pertains solely to workers' compensation rate making, to preclude the Board from obtaining it. NCCI supports this interpretation by comparing Section 59A–17–8 to Section 59A–17–7, which details rate making for types of insurance other than workers' compensation. According to NCCI, the most significant distinction between the two sections is that Section 59A–17–7 allows consideration of investment income and Section 59A–17–8 makes no mention of it. Further, NCCI argues that, by including "underwriting profit" in the calculation of workers' compensation rates, the legislature intended to exclude investment income from consideration. *See Insurance Dep't v. City of Philadelphia,* 196 Pa.Super. 221, 173 A.2d 811 (1961).

NCCI's argument fails to address the legislature's directive to give due consideration "to all other relevant factors." *See*

§ 59A–17–8(A)(1). Recently, the Oklahoma Supreme Court in *State ex rel. Turpen v. Oklahoma State Board for Property and Casualty Rates,* 731 P.2d 394 (Okla.1986), did address a similar statutory directive as applied to the same fact situation presently before this Court. In determining that investment income was a relevant factor, the court stated that "[t]he necessity for disclosure of information on investment income becomes even more clear in light of the industry-recognized axiom that money is made from investments, not underwriting." *Id.* at 403–404. In recent years, the insurance industry has been engaging in cash flow underwriting whereby insurers write risks without regard to underwriting profits, in the expectation of making a profit through investments. *See Massachusetts Auto. Rating and Accident Prevention Bureau v. Commissioner of Ins.,* 384 Mass. 333, 424 N.E.2d 1127 (1981).

The Oklahoma court assessed the relevancy of investment income under a statute which, unlike New Mexico's, calculated inadequacy of rates by whether continual use of such rates endangered the solvency of the insurer. *Oklahoma State Bd. for Property and Casualty Rates,* 731 P.2d at 403. Nonetheless, given the mandate to consider *"all other relevant factors"* to determine the propriety of proposed workers' compensation premiums, we believe it was likewise within the New Mexico Insurance Board's power to request NCCI to submit investment income data under Section 59A–17–8.

If the legislature had intended to exclude investment income from "all other relevant factors," it could have done so explicitly. Instead, it left as a function of the Board to determine what factors may be relevant. We reject the argument that inclusion of a factor in a section not applicable to workers' compensation necessarily, by some rule of logic or construction, makes that factor irrelevant to workers' compensation rates.

 *Company Expenses.* NCCI also maintains that the Board improperly considered NCCI's calculation of insurance company expenses. NCCI relies upon Section 59A–17–8(A)(2), which recognizes that

expense provisions may differ to reflect varying operating methods of insurers or groups of insurers. Further, it is argued, Section 59A–17–14(D) prohibits using expense provisions as a grounds for disapproving a rate filing.

Section 59A–17–14(D) precludes disapproval of a rating plan on grounds that it establishes standards for measuring variations in expense provisions, *provided that the rates thereby produced meet the applicable requirements of Article 17.* It is questionable whether this section applies to NCCI's objection to the Board's consideration of projected company expenses. NCCI failed to show this Court that the Board based its disapproval upon the rate filing's inclusion of specific standards of measuring variations in expense provisions. What's more, the rates produced by use of given expense provisions must meet the applicable requirements of Article 17. According to expert testimony, NCCI applied an erroneous percentage of increase to company expenses because company expenses do not necessarily increase at the same rate as loss payments. The Board concluded that there was no support in the record to substantiate NCCI's projected increase in company expenses. Under Section 59A–17–14(D), the Board properly could consider the accuracy of NCCI's projection for company expenses in determining whether the rate proposal was excessive, inadequate or unfairly discriminatory.

 *Underwriting Losses.* Equally without merit is NCCI's contention that the Board ignored massive underwriting losses contrary to Section 59A–17–8(A)(1). In refusing to approve the rate increase, the Board primarily based its decision upon the inadequacy of data submitted by NCCI in support of its filing. Although NCCI presented evidence that insurers were incurring significant underwriting losses in New Mexico, that did not preclude the Board from disapproving the filing because of other deficiencies in information, such as investment income, which would affect the materiality of underwriting losses. *See Public Serv. Co. of New Mexico v. New Mexico Envtl. Improvement Bd.*, 89 N.M. 223, 549 P.2d 638 (Ct.App.1976).

*Burden of Proof.* NCCI further asserts that the Board applied the incorrect burden and standard of proof in disapproving the rate filing. NCCI maintains that in a proceeding to cancel previously approved rates the burden falls upon the party opposing the rates to prove they violate the statutory requirements. *See Insurance Dep't v. City of Philadelphia*, 196 Pa.Super. 221, 173 A.2d 811 (1961). Section 59A–17–14(B), however, is silent on who has the burden of proof to demonstrate that an effective filing fails to satisfy the requirements of Article 17. To support its argument, NCCI directs our attention to case authority from North Carolina, Pennsylvania and Wyoming.

NCCI misplaces reliance upon *State ex rel. Commissioner of Insurance v. North Carolina Rate Bureau*, 40 N.C.App. 85, 252 S.E.2d 811, *cert. denied*, 297 N.C. 452, 256 S.E.2d 810 (1979). There, the court stated that, in disapproving a rate filing, the Commissioner's decision must be based upon an affirmative showing that the filing fails to comply with statutory standards. *Id.* at 102, 252 S.E.2d at 822. This statement addressed substantial evidence on the entire record, not burden of proof. "[T]he new statutory scheme ["file and use" procedure] does not shift the ultimate burden of proof from the [rate maker] to the Commissioner." *Id.* at 96, 252 S.E.2d at 819. *See also State ex rel. Comm'r of Ins. v. North Carolina Rate Bureau*, 300 N.C. 381, 455, 269 S.E.2d 547, 592 (1980). ("[T]he underlying burden of proving the need and reasonableness of a rate increase rests upon the [rate maker].").

In *Mortgage Guaranty Insurance Corp. v. Langdon*, 634 P.2d 509 (Wyo.1981), the court ruled that once the filing becomes effective the burden falls upon anyone complaining against the rates, including the Commissioner, to demonstrate that they are wrong. *Id.* at 519. The authority cited for this proposition, however, undermines rather than supports this ruling. In *Massachusetts Medical Service v. Commissioner of Insurance*, 346 Mass. 346,

348, 191 N.E.2d 777, 778 (1963), the court held that the burden of furnishing adequate evidence to enable the Commissioner to establish the reasonableness of a rate proposal falls upon the rate maker. Similarly, in *Insurance Services Office v. Whaland*, 117 N.H. 712, 716, 378 A.2d 743, 747 (1977), the court stated that the burden rests upon the rate filer to furnish such data that supports the filing and that satisfies the Commissioner that the statutory requirements have been met.

Only *Insurance Department v. City of Philadelphia*, 196 Pa.Super. 221, 173 A.2d 811 (1961), speaks to a shifting of the burden of proof once a rate filing becomes effective. However, *City of Philadelphia* is distinguishable on its facts. In *City of Philadelphia*, the Commissioner found no reason to disapprove the filing. After the new rates went into effect, the city complained about the rate increase. The inquiry, therefore, focused upon who had the burden to prove that the Commissioner erred in approving a rate proposal. The court held that the burden was upon the city to show that the new rates were not in accordance with statutory requirements.

▌ Unlike *City of Philadelphia*, we must resolve whether the procedures for disapproving a filing after it has become effective (§ 59A–17–14(B)) required the Board to prove the filing failed to satisfy statutory requirements, as opposed to requiring NCCI to prove the filing satisfied Article 17. We find persuasive those authorities which recognize that the burden of proof falls upon the rate maker. *See Massachusetts Medical Serv. v. Commissioner of Ins.*, 346 Mass. 346, 191 N.E.2d 777 (1963); *Insurance Servs. Office v. Whaland*, 117 N.H. 712, 378 A.2d 743 (1977); *State ex rel. Comm'r of Ins. v. North Carolina Rate Bureau*, 300 N.C. 381, 269 S.E.2d 547 (1980); *State ex rel. Comm'r of Ins. v. North Carolina Rate Bureau*, 40 N.C. App. 85, 252 S.E.2d 811, *cert. denied*, 297 N.C. 452, 256 S.E.2d 810 (1979). Notwithstanding an effective filing, absent an express legislative mandate to the contrary, *see State ex rel. Comm'r of Ins. v. North Carolina Rate Bureau*, 300 N.C. at 454,

269 S.E.2d at 592, we will not infer that the burden shifted to the Board to prove that the filing did not satisfy the requirements under Article 17.

NCCI also claims that, by requesting the data and information discussed above, the Board applied a standard of perfection against the rate filing, instead of applying the preponderance standard. NCCI argues that, by ruling against the filing because of perceived imperfections in the supporting data, the Board failed to evaluate the filing by a preponderance of the available evidence. NCCI maintains that it provided the Board with all the information it could muster. However, NCCI took issue with the Board's request for investment income data, standard premium callsheets, and schedule ratings. The Board reasonably found that, more likely than not, it was missing data that was necessary to accurately assess the rate filing.

### SUBSTANTIAL EVIDENCE

▌ *Expert Opinion on Ultimate Facts*. NCCI claims no expert testified that the rate increase was excessive or that there was too little information to assess the filing. No such direct testimony was required. The Board's function was to make the ultimate decision based on the evidence heard and upon its own expertise. The order recited the Board's reasoning and the record upon which it made its decision. *See Bokum Resources Corp. v. New Mexico Water Quality Control Comm'n.*, 93 N.M. 546, 603 P.2d 285 (1979). Our review of the whole record convinces us that substantial evidence exists to support the reasonableness of the Board's decision to disapprove the rate filing.

▌ *Unsworn Testimony*. During the hearing, a number of individuals including then-Governor Anaya and certain state legislators spoke in opposition to the rate increase. NCCI argues that such conduct may be appropriate at an informational hearing, but it is inappropriate in a rate making hearing. *See Connecticut Blue Cross, Inc. v. White*, 31 Conn.Supp. 257, 328 A.2d 442 (1974). NCCI maintains that the Board erred by considering the testimo-

ny of those unsworn witnesses. In *Connecticut Blue Cross, Inc.*, the court stated that if evidence demonstrated that the Commissioner of Insurance was unduly or improperly influenced by the Governor or state legislators, the court would have cause to interfere. *Id.* at 265, 328 A.2d at 446.

NCCI contends that the Board was unduly influenced by Governor Anaya and the state legislators, citing the Board's reference to the Governor's testimony in announcing its decision to disapprove the filing. There is nothing in the Board's order to support the claim that any undue or improper influence was exercised over the Board. One purpose of the hearing was to solicit public input. There certainly was no prohibition against the Governor and legislators voicing their opinions. *See id.* The Board's findings, conclusions and order made no reference to comments received from public officials but, rather, clearly demonstrates that the Board rested its decision upon the testimony of expert witnesses who were under oath and subject to cross-examination.

### CONFISCATORY ACTION

██ Finally, NCCI contends that the Board's action was confiscatory and therefore unconstitutional. NCCI had the burden of proof to demonstrate the confiscatory nature of the current premium rates. NCCI's refusal to disclose investment income data foreclosed any such demonstration. *See National Council on Compensation Ins. v. Superintendent of Ins.*, 481 A.2d 775 (Me.1984). *See also Massachusetts Auto. Rating and Accident Prevention Bureau v. Comm'r of Ins.*, 384 Mass. 333, 424 N.E.2d 1127 (1981).

The Board's December 10 hearing complied with the statutory requirements of Article 17 and due process. On the record as a whole, there is substantial evidence to support the district court's order affirming the Board's decision to disapprove NCCI's rate filing. We affirm.

IT IS SO ORDERED.

SOSA, Senior Justice, and WALTERS, J., concur.

SCARBOROUGH, C.J., and STOWERS, J., dissent.

SCARBOROUGH, Chief Justice, dissenting.

I respectfully dissent. We are concerned here with the question of procedural due process. The notice given to NCCI was inadequate and thus deprived NCCI of due process under law. Written notice of the public hearing provided for an "informal public hearing * * * to receive written and oral comments of interested persons concerning proposed workmen's compensation rate increases."

Before the start of the hearing, Victor Marshall, attorney for NCCI, addressed Commissioner Serna about NCCI's understanding of the nature of the hearing. The following dialogue is contained in the record:

MR. MARSHALL: Before we start, my understanding, based on the notice is that this is an informal hearing to receive comments from anyone who wants to speak in this case. It is also my understanding that this is to be an informal procedure not bound by the usual rules of evidence and testimony, so on and so forth. Is that correct?

MR. SERNA: That is correct, Mr. Marshall. If there is any comment that is to be made today that anybody wishes not to be put under oath, that's fine. I can't imagine anybody who wants to make any statement that is not truthful, though. Unless you have an objection, Mr. Marshall—

MR. MARSHALL: No, I have no objection. I just wanted the nature of the proceeding clarified.

After the proceedings had commenced and despite this discussion between Mr. Marshall and Mr. Serna about the nature of the hearing, Mr. Serna declared the rate hearing to be formal.

MR. SERNA: We are going to proceed as if this is a formal rate hearing. So with that in mind, Mr. Marshall, you may proceed.

Mr. Marshall then made a timely objection to the inadequacy of notice and to the designation of the proceedings as a formal hearing. His objections are preserved in the record.

MR MARSHALL: Thank you. Mr. Chairman and members of the Commission, my comments and objections on that point [proceeding as if it was a formal rate hearing] are in the record so I will just proceed.

Mr. Marshall's objection was sufficient to preserve NCCI's right to this appeal. *See Wolfley v. Real Estate Comm'n,* 100 N.M. 187, 668 P.2d 303 (1983); *Duke City Lumber Co. v. New Mexico Envtl. Improvement Div.,* 101 N.M. 301, 681 P.2d 727 (Ct.App.1983); rev'd 101 N.M. 291, 681 P.2d 717 (1984), on remand 102 N.M. 8, 690 P.2d 451, (1984) *cert. quashed* 101 N.M. 741, 688 P.2d 778 (1984).

The majority characterizes the transformation of the hearings as a "change in format." An abrupt change from an informal to a formal hearing cannot afford a party the procedural protections required by due process of law. Nowhere in the written notice was Marshall or NCCI advised that the informal or even the formal rate hearing would result in a ruling on the merits of the NCCI claim. There was no indication that formal testimony was to be taken, only that "comments of interested persons" would be heard. Contrary to the views of the majority, *Jones v. New Mexico State Racing Comm'n,* 100 N.M. 434, 671 P.2d 1145 (1983) does not support the proposition that NCCI was afforded due process with respect to notice. The oral notice at the hearing that transformed the hearing from an informal one to a formal one lacks the specificity required to give NCCI reasonable notice required by due process. "It is well settled that the fundamental requirements of due process in an administrative context are 'reasonable notice and opportunity to be heard and present any claim or defense.'" *Id.* at 436, 671 P.2d at 1146 (*citing McCoy v. New Mexico Real Estate Comm'n,* 94 N.M. 602, 614, 614 P.2d 14, 16 (1980)). It is generally recognized that the notice must be sufficiently in advance of the hearing to afford a party a reasonable opportunity to prepare an answer, defense, or to summon witnesses. *See McCoy,* 99 N.M. at 603, 614 P.2d at 15.

At the very minimum, due process of law contemplates that litigants must be notified they are facing a ruling on the merits of the respective claim and issues raised by the parties. In this case, the opportunity to present exhibits was never mentioned in the notice. Witnesses, other than "interested persons" were not mentioned. In fact, the list of witnesses who testified reveals that few experts testified. Witnesses included the Governor, NCCI's two witnesses, three state senators, various individuals representing corporations, and members of the public. The thirty public witnesses were afforded three minutes each to testify. In this case, notice of informal proceedings was certain to mislead any attorney who would then be unprepared to present a formal case because of the inherent procedural and evidentiary differences between formal and informal hearings. *See Savina Home Indus. v. Secretary of Labor,* 594 F.2d 1358 (10th Cir. 1979).

Formal hearings differ from informal hearings in that formal hearings contain procedural safeguards that informal ones do not. Formal rules of procedure and evidence are used during formal hearings, witnesses are cross-examined, and exhibits introduced. *Matter of Protest of Miller,* 88 N.M. 492, 496, 542 P.2d 1182, 1186 (Ct. App.1975), reh'g denied, *cert. denied,* 89 N.M. 5, 546 P.2d 70 (1975).

After concluding that notice was sufficient, the majority states that "[t]he 'informal format' designation cannot be construed to have limited the subject matter or significance of the proceedings." The facts set forth in the opinion do not fully develop the issue, but when the record is viewed in its entirety, I must conclude that the statement is wrong. Both the subject matter and the significance of the proceedings were limited by the written notice and the understanding of the participants that there would be only an informal public hearing "to receive written and oral comments of interested persons." Such was

the perception of NCCI in calling only two expert witnesses. Although some exhibits were received in evidence, they were not entered in the fashion required for a formal hearing, as was indicated by Mr. Marshall's objection:

MR. MARSHALL: If we could just note for the record that these exhibits are being handed to us for the first time as they are being given to the witness.

MR. SERNA: The record will so note that.

MR. MARSHALL: I would like to note while we have a lull, this entire line of questioning, all these questions would be objectionable if we were proceeding under strict rules of procedure and evidence. * * *

MR. CARLSON: I would like to ask Mr. Marshall what the basis of his objection is for the record.

MR. MARSHALL: Leading, assumes facts not in evidence. Assumes facts without substance. Basically, attempts to have the lawyer testify rather than the witness. Lack of foundation for—a lack of preliminary foundation for each and every one of the questions that has been asked. Assuming hypotheticals not supported by any evidence in the record.

Clearly, although Commissioner Serna declared the hearing to be a formal one, proper formal procedures were not observed.

The gravity of the proposed actions dictates that there should not have been merely an informal hearing, and that adequate notice of the formal hearing should have been afforded all the parties. However, nothing in this dissent should suggest what result the State Corporation Commission should reach after a full hearing on the merits is afforded to the appellant. This case should be reversed and remanded to the State Corporation Commission with instructions to afford NCCI a hearing on the merits of its claims and defenses.

STOWERS, J., joins in dissent.